SECURITIES AND EXCHANGE
COMMISSION, Plaintiff–
Appellee,

v.

FIRST JERSEY SECURITIES, INC. and
Robert E. Brennan, Defendants–
Appellants.

Nos. 1154, 1155, Dockets 95–6192, 95–6194.

United States Court of Appeals,
Second Circuit.

Argued April 10, 1996.

Decided Dec. 10, 1996.

Jacob H. Stillman, Associate General Counsel, Washington, D.C. (Simon M. Lorne, General Counsel, Susan Ferris Wyderko, · Mark Pennington, Senior Litigation Counsel,

Paul Gonson, Solicitor, Washington, D.C., on the brief), for Plaintiff–Appellee.

Ronald J. Riccio, Newark, NJ (W. Hunt Dumont, Claire C. Cecci, John B. Livelli, Robinson, St. John & Wayne, Newark, NJ, on the brief), for Defendant–Appellant First Jersey Securities, Inc.

A. Leon Higginbotham, Jr., New York City (Allan Blumstein, Richard A. Rosen, Edward S. Zas, William C. Silverman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, David M. Schraver, Nixon, Hargrave, Devans & Doyle, Rochester, NY, on the brief), for Defendant–Appellant Robert E. Brennan.

Before: LUMBARD and KEARSE, Circuit Judges, and MORAN, District Judge *.

KEARSE, Circuit Judge:

Defendants First Jersey Securities, Inc. ("First Jersey" or the "Firm"), and Robert E. Brennan appeal from a judgment entered in the United States District Court for the Southern District of New York following a bench trial before Richard Owen, *Judge,* holding defendants liable for violations of § 17(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77q(a) (1994); § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1994); and Securities and Exchange Commission ("SEC" or the "Commission") Rule 10b–5, 17 C.F.R. § 240.10b–5 (1995), in the sale, repurchase, and resale of six securities. The district court ordered defendants jointly and severally to disgorge the sum of $22,288,099, plus $52,689,894 in prejudgment interest; enjoined them from further securities laws violations; and appointed a special agent (the "Special Agent") to determine whether, in 1982–1987, defendants had committed securities law violations beyond those proven at trial. On appeal, defendants contend principally that the present action was barred by res judicata and that the court erred in imposing liability and in fashioning relief. Brennan also challenges, *inter alia*, the dis-

trict court's order that he be held jointly and severally liable for the entire amount of disgorgement ordered by the court. For the reasons below, we reverse so much of the judgment as appointed the Special Agent, and in all other respects we affirm.

## I. BACKGROUND

The present action was commenced by the SEC in 1985, based on allegations that, beginning in November 1982 and continuing into 1985, First Jersey, with Brennan at the helm, had employed a massive and coordinated system of fraudulent practices to induce its customers to buy certain securities from the Firm at excessive prices unrelated to prevailing market prices, resulting in defendants' gaining more than $27 million in illegal profits from their fraudulent scheme. The following facts were found by the district court to have been established at trial and are not challenged by defendants.

### A. *First Jersey's Business Practices*

First Jersey was founded in 1974 as a discount broker-dealer specializing in the underwriting, trading, and distribution of low-priced securities. The vast majority of securities traded by First Jersey were sold primarily in the over-the-counter market and not listed on any national exchange. By 1985, the Firm operated 32 branch offices throughout the United States and 36 offices in foreign countries, and had more than 500,000 retail-customer accounts. It employed approximately 1,200 salespersons or "registered representatives." In hiring such sales personnel, First Jersey typically sought individuals who had no prior experience in the securities business.

A First Jersey registered representative's working month consisted of a three-part cycle. The first two weeks of the month were spent "cold calling," *i.e.,* telephoning individuals who were not customers of the Firm and whose names were found in general directories, to identify persons who might be interested in purchasing a security recommended

---

* Honorable James B. Moran, of the United States District Court for the Northern District of Illinois, sitting by designation.

by the Firm. The second phase began around the third week of the month, when the manager of the branch informed the sales personnel that a recommendation would be forthcoming from the research department in about a week; the manager at that time gave the salespersons no specific information about the security. The salespersons then renewed contacts with their potential customers, informing them that the Firm's research department was about to make a recommendation and seeking to determine how much money a customer would be willing to invest in a First Jersey-recommended security.

The third phase of the cycle began during the fourth week of the month, with the branch manager conducting a sales meeting to disclose to the branch's salespersons the name of the recommended security; only one security at a time was recommended to a given branch; but not all of the branches received the same recommendation. The branch manager relayed information received from the Firm's main office in New York about the recommended security, including its price and the sales commission to be paid. The branch manager also gave the salespersons a scripted sales pitch, which they were required to record and were expected to use virtually verbatim in offering the security to customers. The sales pitch usually described the security as reflecting "a spectacular turnaround situation."

At various times, salespersons were given written materials that included First Jersey research reports, annual reports of the recommended company, and newspaper articles. There generally was no discussion, however, of negative factors such as risks inherent in a recommended security. Further, salespersons were discouraged from conducting independent research on Firm-recommended securities and were not even permitted to contact the Firm's research department about a security without getting permission from the branch manager. In addition, for reasons that will become apparent below, the salespersons at any given branch were prohibited from discussing the Firm's recommendations for their branch with salespersons from other First Jersey branches.

Following the sales meeting, salespersons were to spend the remainder of the month attempting to sell the recommended security—and only that security—to their clients. Salespersons who chose not to sell the recommended security were berated and often censured by First Jersey's management. Further, the compensation structure placed a premium on selling the recommended security. If a client bought the recommended security, the salesperson received a commission in the range of 5%–10% of the price. If the client instead bought a different security, the salesperson received a commission of one percent or less. And for the client's sale of a security, the salesperson received no commission at all. When clients sold previously purchased First Jersey-recommended securities back to the Firm, they were urged to roll the proceeds over into another First Jersey-recommended security. As a result of the commission structure, First Jersey salespersons rarely recommended that their customers purchase any securities other than the one currently recommended by the Firm.

First Jersey received the vast majority of its revenues from trading securities for its own accounts, including securities that it had underwritten. Between November 1982 and August 1986, First Jersey acted as the sole underwriter for at least 31 new issues of securities that were sold in "units" consisting of a combination of shares of common stock and warrants that could later be redeemed for common stock. It was the Firm's regular practice to have sales personnel in a group of branch offices first sell a particular unit and then, shortly thereafter, urge the clients who had purchased those securities to resell them to First Jersey at a slight profit to the client. Then the Firm split the repurchased units and sold the components separately through other branch offices to new customers, at a significantly higher total price than the Firm had paid the original customer.

For example, in November 1982, First Jersey was the underwriter for 1,100,000 units of Sovereign Chemical and Petroleum Products, Inc. ("Sovereign"). Each unit consisted of three shares of common stock and one warrant; the units were not to be split prior to May 1, 1993, except at First Jersey's

option. On November 9, 1982, the first day of the offering, First Jersey oversold, selling to customers of certain of its branches approximately 1,700,000 units at the offering price of $3 per unit, for a total price of $5,100,000. Within days, First Jersey bought back more than 1,300,000 units, paying $3.50 per unit; it immediately split the units into their components and priced each of the three shares of stock at $2.25–$2.50 and the warrant at $1. Thus, a unit purchased by First Jersey for $3.50 could be promptly resold, after the unbundling of the components, for a total of approximately $8. First Jersey immediately resold more than 3,000,000 shares of Sovereign common stock and 1,000,000 Sovereign warrants to customers of Firm branches other than the branches that had originally sold and repurchased the units. First Jersey's profit on the resale of the Sovereign securities totaled $5,172,292. The same pattern was followed with respect to securities of five other issuers: Quasar Microsystems, Inc. ("Quasar"), QT & T, Inc. ("QT & T"), Rampart General, Inc. ("Rampart"), Sequential Information Systems, Inc. ("Sequential"), and Trans Net Corp. ("Trans Net").

The Firm did not inform the salespersons who were to suggest that customers resell recommended units to First Jersey that the Firm would immediately split the repurchased units into their component securities and sell the components separately for more than twice what it paid the selling customer. The salespersons who thereafter sold the individual components were not advised of the Firm's original underwriting of the unit. Nor were they provided with a prospectus or advised of the risks disclosed in the prospectus. The reason that First Jersey sales personnel were forbidden to discuss the recommendations for their branch with their counterparts at other First Jersey branches was to prevent them from learning that some branches were buying back units cheaply while other branches were selling components from those units to other Firm clients at inflated markups.

At all relevant times, Brennan was a director and the 100% owner of First Jersey. Between January 1982 and August 1985, he was its president; in September 1985, he became its chairman and chief executive officer. In his capacity as sole shareholder and president or chief executive officer, Brennan met regularly with the heads of First Jersey's departments, made the final decisions concerning which securities the Firm would underwrite, and frequently participated in negotiations concerning the prices at which First Jersey sold the securities. Brennan testified at trial that he periodically received reports on First Jersey's positions in various securities, regularly reviewed the research reports issued to the branch offices, and "typically was aware of most of the research reports that went out, if not all." He also participated in meetings at which the Firm's pricing policies were formulated, and he regularly discussed the Firm's compliance, see Part III.C.2. below, with rules promulgated by the National Association of Securities Dealers, Inc. ("NASD"). Although at trial, Brennan denied any wrongdoing, he did not indicate that the actions challenged here were unauthorized acts of other executives.

## B. The Present Litigation

The SEC commenced the present action in October 1985, alleging that the above practices constituted illegal markups and frauds on First Jersey's customers in violation of § 17(a) of the 1933 Act, § 10(b) of the 1934 Act, and Rule 10b–5. The complaint sought disgorgement of the profits gained from those practices, as well as injunctive and other equitable relief.

Defendants moved to dismiss the complaint on the grounds, inter alia, that it was barred by principles of res judicata in light of an administrative proceeding initiated by the SEC in May 1979 and settled in November 1984. The district court rejected the res judicata defense, noting that the administrative proceeding, discussed in greater detail in Part II below, concerned First Jersey's trades in a certain group of securities during the 1970s, whereas the present case involved its trades in different securities in the 1980s. The court concluded that the two sets of claims were not identical for purposes of res judicata.

A 41–day bench trial was held in 1994, at which the court received voluminous documents and extensive testimony, including live, videotaped, or transcribed deposition testimony of 12 former First Jersey salespersons called by the SEC, 22 former First Jersey branch managers and salespersons called by defendants, and several First Jersey officers, including Brennan. In a written opinion dated June 19, 1995, reported at 890 F.Supp. 1185, the court concluded that the SEC had

> overwhelmingly proven that defendants First Jersey and Brennan with respect to the sales and resales of securities involved herein to First Jersey customers violated § 17(a), § 10(b), and Rule 10b–5 in that with scienter, they deliberately used fraudulent devices in those transactions. Specifically, First Jersey's sales practices were intended by defendants to operate, and did operate, as a pervasive fraud on First Jersey's hundreds of thousands of retail customers....

890 F.Supp. at 1209. The court found that in selling and repurchasing the unit securities, and reselling the components, First Jersey violated those provisions in two ways, to wit, by withholding material information from customers and by making excessive markups in the prices of the unbundled securities.

As to the first type of violation, the court found that defendants engaged in "a massive and continuing fraud on its customers," *id.* at 1195, both on the initial group of First Jersey customers, *i.e.*, those who resold to the Firm at a small profit without being informed that the units were about to be unbundled and sold at a much higher price, and on the second group of First Jersey customers, *i.e.*, those who purchased the unit components for prices that, in light of the price of the units, were artificially inflated. The court found that the goal

> of the scheme was to leave both the customers selling securities back to [First Jersey] (usually "units") and the customers purchasing securities from [First Jersey] (usually "unit" components), completely ignorant of the way in which First Jersey had in all other respects dealt in those securities, and as to the sales of the com-

ponents, First Jersey's salesmen knew almost nothing about the companies, and knew they were selling to buyers who knew even less.

*Id.* The court found that

> [d]efendants First Jersey's and Brennan's conduct[ ] was entirely purposeful. It was planned this way. This is clear not only from the patterned and repeated format of the trading, but also from the simple programmed structure of First Jersey's marketing system. Defendants orchestrated every facet of First Jersey's branch office network to ensure that the firm's underwritings and other low-priced stock recommendations were sold *when* they wanted—*where* they wanted—at prices determined not by market forces but by First Jersey itself. Its salesmen themselves, with minimal information and the incentive of earning as much as ten percent (plus a five percent managers' override) on a customer's investment dollar, were accordingly able to sell to the firm's customers securities at illegal markups up to as much as 150 percent.

*Id.* (emphasis in original) (footnote omitted).

The court concluded that, particularly in light of First Jersey's domination and control of the markets for the securities in question, its conduct constituted securities fraud under precedents dating back half a century.

As to the second type of violation, the district court found that "the evidence overwhelmingly established that the defendants wilfully and deliberately violated established law forbidding excessive markups" in the sale price of the securities. *Id.* at 1197. The court stated that:

> [t]he starting point in determining the legality or illegality of a broker's markup on a sale of stock is the establishment, from the best available evidence, of the prevailing market price.... This is a factual, not a legal search.

*Id.* Concluding that First Jersey was not a "market maker" in any of the securities because it did not "hold[ ] itself out to the broker-dealer community as standing ready to purchase and sell that security at particular quoted bid and asked prices," *id.*, the

court quoted the applicable SEC guidelines for determining prevailing market price as follows:

> "The best evidence of the prevailing market price for a broker-dealer who is not making a market in the security is that dealer's contemporaneous cost of acquiring a security.... Where ... a security is not only inactively traded between dealers, but a competitive market does not exist because that market is 'dominated' by a single dealer, the use of market maker sales or quotations is likely to be impractical or misleading. In such a 'dominated' market, the best evidence of prevailing market price is the dealer's contemporaneous cost, which is either the price that the dealer paid to other dealers, or the price that the dealer paid to its retail customers to acquire the security, after an adjustment that allows the dealer a markdown on purchases from customers."

*Id.* at 1197–98 (footnote omitted) (quoting Zero–Coupon Securities Release No. 34–24368, 38 S.E.C. Docket 158, 1987 WL 112328 (Apr. 21, 1987)). The court found that First Jersey dominated and controlled the markets for the six securities at issue because the vast majority of the transactions in those securities were conducted by First Jersey. The court further noted that although the Firm made some purchases in the interdealer market, those trades were insignificant because their volume was tiny in comparison to the Firm's "massive retail trading" in those securities with its own customers. 890 F.Supp. at 1200. Having determined that First Jersey was not a market maker in any of those securities, the court concluded that, under the SEC guidelines, the best measure of the securities' prevailing market price was the Firm's cost of acquiring the units from its customers.

To calculate the contemporaneous cost of the units' components, given the prevailing market price of the units, and hence the markup enjoyed by First Jersey, the court adopted an allocation formula proposed by the SEC, which the court described using the following example:

> If a unit consists of two shares of common and one warrant, and First Jersey buys [the unit] back from a customer for $1 and then sells the common at $.75 a share and the warrant at $.50, the First Jersey sales price for a unit equivalent is [a total of $1.50 for the common plus .50 for the warrant, for a total of $2]. Thus, under the allocation formula, 1 share of common is 37.5% of the unit equivalent and 1 warrant is 25%. Applying that percentage to the acquisition cost of the unit, each share of common has a cost basis of $.375....

890 F.Supp. at 1200 n. 23. Whether the focus be on a single share of the common stock (essentially purchased for $.375 and resold for $.75) or on all of the elements comprised by the unit (purchased for $1 and resold for a total of $2), First Jersey's markup would have been 100%. In the securities at issue here, the court concluded that First Jersey enjoyed markups of up to 150%.

The court noted that First Jersey did not call either its head trader or its head of sales to testify as to how the Firm arrived at its markups. Nor had the expert who testified on First Jersey's behalf posed that question to anybody at First Jersey. The court concluded that the markups were plainly excessive.

The district court ruled that Brennan was primarily liable with First Jersey for the securities violations committed by the Firm. The court based its finding on trial evidence that

> showed plainly that Brennan was a "hands-on" manager who was intimately involved in the operations of First Jersey, including all significant decisions regarding the firm's underwriting, retail sales and trading activities. Brennan signed every one of the underwriting agreements at issue in this case and admitted that he "typically" participated in the key decision to split "units" into their component securities.

> In his trial testimony Brennan ... never denied knowing that First Jersey had repeatedly underwritten "units", and bought the units back from its customers, and had broken up the units, and resold the components to other customers without disclosing the price at which it had repurchased the units. To the contrary, he defended those transactions, taking the position that

First Jersey's massive and repeated over-sales and repurchases of units were, essentially, accidental, and that the firm's unit repurchases and the prices at which they were acquired, were not material to the customers who bought the components.

*Id.* at 1201. The court observed that, as the 100% owner of First Jersey during the relevant period, Brennan received periodic reports on the Firm's positions in the securities it traded and, with regard to the Firm's commission policy, that "he could have made any decision he wanted to," *id.* (internal quotation marks omitted). The court concluded that Brennan's control over First Jersey's activity made him liable as a principal for the Firm's fraudulent conduct.

The court also concluded that the evidence of First Jersey's violations and Brennan's position and conduct established Brennan's joint and several liability for the violations as a "controlling person" of the Firm under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) (1994). It noted that "as president, chief executive officer, and sole shareholder of First Jersey, Brennan possessed control over every aspect of First Jersey's operations," 890 F.Supp. at 1202. Applying the burden-shifting scheme articulated by this Court in *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), the court held that the burden had shifted to Brennan to show that he had in good faith "maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel," 890 F.Supp. at 1202 (internal quotation marks omitted), and hence should not be held liable for violations by the Firm. The court found that Brennan had not met that burden. Reviewing the evidence as to the compliance procedures adopted by First Jersey, described in greater detail in Part III.C.2. below, the court found that those procedures were more cosmetic than real, and that they "were never intended for more than appearances should an occasion such as this arise." *Id.* at 1203.

As relief for the proven violations, the court ordered, *inter alia,* that First Jersey and Brennan disgorge the profits gained by the Firm as a result of the frauds with respect to the six securities at issue, and pay prejudgment interest on those sums from the dates of the gains through the entry of judgment—a period of up to 12+ years. The court calculated the Firm's unlawful profits with respect to each issuer as follows:

| Issuer | First Jersey's Profit |
|---|---|
| QT & T | $ 581,659 |
| Quasar | 6,302,659 |
| Rampart | 2,110,617 |
| Sequential | 12,111,384 |
| Sovereign | 5,172,292 |
| Trans Net | 1,009,488 |
| **Total** | **$27,288,099** |

*Id.* at 1211. Giving defendants credit for a $5 million payment they made in January 1987 to settle a class action based on transactions in some of these securities, *see id.* at 1211 n. 35, the court ordered defendants to disgorge $22,288,099 in unlawful profits. After excluding interest on the $5 million from the date of the payment, *see id.* at 1212, the court ordered defendants to pay prejudgment interest in the total amount of $52,689,-894, *see* Judgment dated July 17, 1995.

In addition, the district court permanently enjoined defendants from further violations of the securities laws, finding that it was "highly likely" that such future violations would occur. 890 F.Supp. at 1210. This finding was based in part on defendants' history of "[b]rushes" with regulatory agencies in the securities industry, *see* Part IV.C. below, which had already resulted in censures, fines, and suspensions, and injunctions. The court observed that, while First Jersey had sold most of its retail branches in 1987, the Firm continued to operate on a day-to-day basis and that at the time of trial Brennan was still the 100% owner of First Jersey's stock, as well as the sole or majority shareholder of a number of other corporations "through which he has the power to and does continue his activities in the securities field." 890 F.Supp. at 1208.

Finally, noting the evidence of violations during a two-year period with respect to the securities of Sovereign, Rampart, Quasar, Trans Net, Sequential, and QT & T, and

noting "the background of defendants' sales and business practices," the district court stated that it was "thoroughly convinced under any standard that the particular violations proved at trial are in all probability only the tip of the iceberg." *Id.* at 1212. The court stated that it would therefore appoint a Special Agent to determine whether in 1982–1987 there had been other violations as well and to recommend to the court further disgorgements. The court premised this order on its general equity powers:

> Under the law, "[o]nce the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d [1082, 1103 (2d Cir.1972) ]; *see also SEC v. Posner,* 16 F.3d 520, 521 (2d Cir. 1994). Accordingly, I conclude that under the Court's general equitable powers, a special agent should be appointed to examine the records of defendant First Jersey Securities for the period from November 1, 1982 through January 31, 1987, for the purpose of determining whether there exists [*sic* ] excessive markups and/or markdowns charged to [Firm] customers, beyond those proved at trial. Should any such excessive markups or markdowns be determined, the special agent shall recommend to the Court that defendants disgorge and pay over, as the Court may direct, all illegally-obtained profits.

890 F.Supp. at 1212–13.

Judgment was entered accordingly, and this appeal followed.

On appeal, defendants do not challenge the court's factual findings as to First Jersey's business practices, but they make a variety of challenges to the court's rulings as to procedure, liability and relief. They contend (1) that the district court should have dismissed the action on the ground of res judicata; (2) that the court erred in concluding (a) that First Jersey's markups were excessive and violated the securities laws, and (b) that Brennan should be held personally liable for those violations; and (3) that the court abused its discretion in (a) ordering disgorgement, (b) calculating prejudgment interest, (c) issuing a permanent injunction, and (d) appointing a special agent. For the reasons that follow, we find error only in the appointment of the Special Agent. In all other respects, we affirm.

## II. THE RES JUDICATA DEFENSE

Defendants contend that the present action was barred by principles of res judicata as a result of a settlement agreement with the SEC in November 1984 ("1984 Settlement"). That agreement settled an administrative action commenced by the SEC in 1979 (the "1979 Proceeding"), along with an unrelated civil injunctive action that had been brought by the SEC in the United States District Court for the Southern District of New York in 1983, alleging federal securities laws violations by Brennan and First Jersey in the purchase and sale of securities of Geosearch, Inc. in 1980 (the "Geosearch action"). The principal focus of defendants' res judicata claim is the administrative proceeding.

In the 1979 Proceeding, the SEC charged that First Jersey and a number of its principals, including Brennan, had violated the federal securities laws in transactions that occurred between 1975 and 1978. The SEC alleged that First Jersey and Brennan had, *inter alia,* "employed manipulative and deceptive devices and contrivances and employed devices, schemes and artifices to defraud" by selling seven securities, including certain securities of Sequential and Rampart, at excessive markups above the prevailing market price for the securities. (1979 Order for Public Proceeding and Notice of Hearing ("1979 Notice") at ¶ M.) It alleged that the prices that First Jersey charged to its customers were "the result of [the Firm's] domination and control of the market in which such securities were traded." (*Id.*)

Proceedings before an SEC administrative law judge on these charges began in November 1979. The hearings were adjourned in October 1980 to allow the parties to pursue settlement negotiations. The negotiations eventually resulted in the 1984 Settlement, pursuant to which the SEC agreed to dismiss both the 1979 Proceeding and the Geosearch action with prejudice. In exchange for that

dismissal, Brennan and First Jersey consented to (a) the entry of a permanent injunction prohibiting them from committing future violations, and (b) the appointment of an independent securities consultant to monitor First Jersey's sales practices. A Final Judgment of Permanent Injunction by Consent was entered in the Geosearch action, enjoining Brennan and the firm from "bidding or purchasing for any account in which it has a beneficial interest, any security which is the subject of such distribution." *SEC v. First Jersey Securities, Inc.*, 83 Civ. 0483(MP) (S.D.N.Y. Judgment Nov. 20, 1984). The consent, executed by Brennan, stated

> that the Commission ha[d] represented to First Jersey that upon the entry of this Permanent Injunction by Consent the Commission will forthwith enter an Order, in the form agreed to by the parties, dismissing, with prejudice, the Order for Public Proceedings issued by the Commission on May 17, 1979, ... and that the Commission will not institute an administrative proceeding against First Jersey or Robert E. Brennan on the basis of the annexed Permanent Injunction by Consent, or the Permanent Injunction by Consent of Robert E. Brennan filed concurrently herewith,

but that the Commission had otherwise made First Jersey no promises. *Id.* (Consent dated November 20, 1984, at 9–10).

The present action was commenced by the SEC in October 1985, alleging frauds by First Jersey and Brennan beginning in November 1982 and continuing into 1985. Defendants sought summary dismissal on the basis that the SEC was aware of at least some of the transactions at issue here prior to settling the 1979 Proceeding and that these claims could have been litigated during the 1979 Proceeding. They argued that "the stock manipulation scheme alleged in the current SEC Complaint is the same as the scheme alleged in both the 1979 Notice and during the 1979–80 hearings"; that the "material issues raised in the SEC's current Complaint are in many respects identical to the issues raised by the SEC in the 1979 Order and the 1979–80 hearings"; and that "[t]he only difference ... between the issues raised by the prior 1979 Order and the issues raised by the current SEC Complaint is that the stock transactions in the current SEC Complaint cover a later time period." (Affidavit of Franklin D. Ormsten dated November 26, 1985, ¶ 5.) Defendants pursue their res judicata defense on appeal. We conclude that the district court properly rejected it.

 Under the claim preclusion branch of res judicata, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981).

> Simply put, the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, [i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

*Nevada v. United States*, 463 U.S. 110, 129–30, 103 S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983) (internal quotation marks omitted). The doctrine may be applied to judgments of administrative agencies acting in an adjudicative capacity. *See, e.g., Astoria Federal Savings & Loan Association v. Solimino*, 501 U.S. 104, 107–08, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991); *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966); *Greenberg v. Board of Governors of the Federal Reserve System*, 968 F.2d 164, 168 (2d Cir.1992).

 With respect to the determination of whether a second suit is barred by res judicata, the fact that both suits involved essentially the same course of wrongful conduct is not decisive, *see, e.g., Prime Management Co. v. Steinegger*, 904 F.2d 811, 815 (2d Cir.1990); nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues, *see, e.g., NLRB v. United Technologies Corp.*, 706 F.2d 1254, 1259–60 (2d Cir. 1983). A first judgment will generally have

preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is "whe[re] the same evidence is needed to support both claims, and whe[re] the facts essential to the second were present in the first." *NLRB v. United Technologies Corp.*, 706 F.2d at 1260; *see also Nevada v. United States*, 463 U.S. at 128–30, 103 S.Ct. at 2917–19 (court must determine whether same "cause of action" is sued on); *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955) ("a prior judgment is res judicata only as to suits involving the same cause of action"); *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d Cir.1992), *cert. denied*, 506 U.S. 1053, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993); *Saud v. Bank of New York*, 929 F.2d 916, 919 (2d Cir.1991).

■ If the second litigation involved different transactions, and especially subsequent transactions, there generally is no claim preclusion. *See, e.g., Lawlor v. National Screen Service Corp.*, 349 U.S. at 328, 75 S.Ct. at 868–69 (no res judicata bar to claim for anticompetitive conduct occurring subsequent to first suit); *Greenberg v. Board of Governors of the Federal Reserve System*, 968 F.2d at 168–70 (same re different financial transactions); *Prime Management Co. v. Steinegger*, 904 F.2d at 816 (same re subsequent breaches of contract); *NLRB v. United Technologies Corp.*, 706 F.2d at 1260 (same re subsequent labor conflicts over same type of employee activity at different times and places, involving different employees). For example, when a contract was to be performed over a period of time and one party has sued for a breach but has not repudiated the contract, res judicata will preclude the party's subsequent suit for any claim of breach that had occurred prior to the first breach-of-contract suit, but will not preclude a subsequent suit for a breach that had not occurred when the first suit was brought. *See id.*; *Restatement (Second) of Judgments* § 24 comment d.

■ These principles confirm the correctness of the district court's rejection of defendants' res judicata defense in the present case. The 1979 Proceeding was initiated by an administrative complaint that charged vio-

lations with respect to First Jersey's transactions in seven securities in 1975–1979. The evidentiary hearing on those charges began in 1979 and continued into 1980. At the time the SEC filed its charges and throughout the period of the hearing, the transactions at issue here had not yet occurred. Plainly, the SEC could neither have included its present claims with respect to transactions occurring in 1982–1985 in its 1979 administrative charge nor proven those transactions in a hearing that did not extend past 1980. The claim that First Jersey defrauded customers in the sale, purchase, and repurchase of certain securities in 1975–1979 is not the same as· the claim that First Jersey defrauded customers in the sale, purchase, and repurchase of other securities in 1982–1985.

■ If a defendant engages in actionable conduct after a lawsuit is commenced, the plaintiff may seek leave to file a supplemental pleading to assert a claim based on the subsequent conduct. *See* Fed.R.Civ.P. 15(c). But he is not required to do so, and his election not to do so is not penalized by application of res judicata to bar a later suit on that subsequent conduct:

> The scope of litigation is framed by the complaint at the time it is filed. *The rule that a judgment is conclusive as to every matter that might have been litigated does not apply to new rights acquired pending the action* which might have been, but which were not, required to be litigated. . . . Plaintiffs may bring events occurring after the filing of the complaint into the scope of the litigation by filing a supplemental complaint with leave of the court, . . . but there is no requirement that plaintiffs do so.

*Los Angeles Branch NAACP v. Los Angeles Unified School District*, 750 F.2d 731, 739 (9th Cir.1984) (internal quotation marks omitted) (emphasis added), *cert. denied*, 474 U.S. 919, 106 S.Ct. 247, 88 L.Ed.2d 256 (1985); *see also Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir.1992) (decision whether or not to attempt to assert claims that arose subsequent to the filing of the action "is optional for the plaintiff; the existence of the doctrine of res judicata does not make the filing of supplements mandatory").

Defendants assert that the SEC's present claims "could have been alleged" or "might have been raised" in the 1979 Proceeding (First Jersey brief on appeal at 14, 24), but they cite no authority holding that a claim that arose after a suit was commenced but prior to judgment is barred by res judicata if not pursued through a supplemental pleading. Their reliance on a statement in *Hawkins v. Risley* that "[t]he date of judgment, not the date of filing, controls the application of *res judicata* principles," 984 F.2d 321, 324 (9th Cir.1993) (internal quotation marks omitted), is misplaced. The *Hawkins* court was not concerned with the question of claims that arose during the pendency of a lawsuit; the quoted statement was made in response to the plaintiff's argument that res judicata did not apply because the judgment to be given preclusive effect concluded an action that had been commenced later than the still-pending action in which it was to be given that effect. The holdings in *Lawlor v. National Screen Service Corp.* and *Teltronics Services, Inc. v. L M Ericsson Telecommunications, Inc.*, 642 F.2d 31, 35 (2d Cir.) ("*Teltronics*"), cert. denied, 450 U.S. 978, 101 S.Ct. 1511, 67 L.Ed.2d 813 (1981), likewise provide no support for defendants' position. Though the opinion in *Lawlor* included the statement that "judgment precludes recovery on claims arising prior to its entry," 349 U.S. at 328, 75 S.Ct. at 868, that statement was dictum insofar as it might be applied to claims that arose after a complaint was filed, for in *Lawlor,* all of the claims raised in the second action were based on acts that occurred either prior to the commencement of the first action or subsequent to the entry of judgment in that action. And the reference in *Teltronics* to the *Lawlor* language, see 642 F.2d at 36, was likewise dictum, since *Teltronics* involved a second suit that, though more detailed, asserted precisely the same claims as the first, see *id.* at 35 ("In this case the same parties, the same cause of action and the same facts form the basis of the second complaint.").

We reject the notion that the SEC had a procedural obligation to expand the scope of the 1979 Proceeding to assert claims that First Jersey engaged in unlawful acts and transactions after the commencement of that proceeding or be forever barred from challenging that subsequent conduct. A government agency charged with enforcing the law has no greater obligation than does a private plaintiff to file a supplemental pleading with regard to a defendant's subsequent acts. The notion that the agency must either perpetually expand its charges to pursue new unlawful acts in an ongoing proceeding or lose the ability to pursue the persistent violator for misdeeds between the start and conclusion of the proceeding would in effect confer on the miscreant a partial immunity from liability for future violations. Such a notion is both antithetical to the regulatory scheme and inconsistent with the doctrine of res judicata.

Finally, there is no basis in the record for defendants' additional argument that litigation of the present issues was foreclosed by the 1984 Settlement itself. Though litigation settlements can resolve issues not raised in the pleadings, any such resolution depends on the intent of the parties to the settlement, *see, e.g., Greenberg v. Board of Governors of the Federal Reserve System,* 968 F.2d at 168, and the record contains no suggestion of any such intent here. Attorneys for defendants corresponding with the SEC shortly before the 1984 Settlement wrote that the settlement should include only the issues raised in the 1979 Proceeding and the Geosearch action. Defense counsel advised the Geosearch court that the agreement would settle "all outstanding matters with the SEC on the following terms: .... The SEC will dismiss all *allegations contained in* " the 1979 Proceeding (Letter of Andrew J. Maloney to Judge Milton Pollack dated November 7, 1984, at 1–2 (emphasis added)); the allegations in the 1979 Proceeding did not include First Jersey's 1982–1985 acts. And the consent executed by defendants stated that, except for agreeing to dismiss the 1979 Proceeding and not to institute an administrative proceeding against First Jersey or Brennan on the basis of the injunction agreed to in the Geosearch action, the Commission had made them no other promises. The present action by the SEC was not barred.

## III. LIABILITY

Section 17(a) of the 1933 Act makes it unlawful for any seller of securities, using the mails or an instrumentality of interstate commerce, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act prohibits both sellers and buyers of securities, using the mails or an instrumentality of interstate commerce or the facility of a national securities exchange, from employing "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated under § 10(b), makes it unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The proscriptions of § 10(b) and Rule 10b–5 were meant to be broad and, by repeated use of the word "any," are obviously meant to be inclusive. The Court has said that the 1934 Act and its companion legislative enactments [including the 1933 Act] embrace a "fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.... Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"

*Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (footnote omitted). The basic aim of the antifraud provisions is to "prevent rigging of the market and to permit operation of the natural law of supply and demand." *United States v. Stein,* 456 F.2d 844, 850 (2d Cir.), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972). The theory of a natural, unrigged market is that the "competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just price." H.R.Rep. No. 1383, 73rd Cong., 2d Sess., at 11 (1934).

To this end, § 17(a) and Rule 10b–5 expressly prohibit misstatements and omissions as to facts that are material. A fact will be considered material within the meaning of these provisions "if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total" mix of information available.'" *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 267–68 (2d Cir.1993) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)) (interpreting § 10(b)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *see SEC v. Rogers,* 790 F.2d 1450, 1458 (9th Cir.1986) (interpreting § 17(a)). The materiality of an item of information is a mixed question of law and fact. *See, e.g., TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 450, 96 S.Ct. at 2132–33. The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The factual component requires an inference as to

whether the information would likely be given weight by a person considering that question. *See, e.g., TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 450, 96 S.Ct. at 2132–33.

In order to establish primary liability under § 10(b) and Rule 10b–5, a plaintiff is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) .or used a fraudulent device. *See, e.g., Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993); *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 581 (2d Cir.1990), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, *see, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976); or at least knowing misconduct, *see, e.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 382–83, 103 S.Ct. 683, 687–88, 74 L.Ed.2d 548 (1983) (mere negligence not sufficient); *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984). Whether or not a given intent existed, is, of course, a question of fact. *See, e.g., id.* at 1059.

With respect to § 17(a)(1), essentially the same elements must be established in connection with the offer or sale of a security. *See generally Zerman v. Ball,* 735 F.2d 15, 23 (2d Cir.1984) ("[G]iven the similarity of the text of § 17(a) of the 1933 Act to that of Rule 10b–5, we conclude that if a private right of action exists under § 17(a), [plaintiff] has stated a claim upon which relief may be granted against [defendant] under .that section as well."); *Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981) ("Since Section 17(a), like Section 10(b), sounds in fraud, similar allegations are required to state a claim under that section."). Scienter, however, need not be established for the SEC to obtain an injunction under of §§ 17(a)(2) or (3). *See Aaron v. SEC,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 1958–59, 64 L.Ed.2d 611 (1980).

## A. *First Jersey's Nondisclosure of Material Facts*

The district court ruled, first, that First Jersey violated § 17(a)(1), § 10(b), and Rule 10b–5 by failing to disclose material facts to its customers with respect to, *inter alia,* the companies whose securities it was trading with them, the nature of the market for those securities, the Firm's control over that market, and the Firm's plans for immediate unbundling and resale of the repurchased securities at a far higher price than what it would pay to repurchase them. The court found that, by these nondisclosures, defendants succeeded in perpetrating massive and pervasive frauds on First Jersey's hundreds of thousands of customers, and that defendants had acted with scienter in that they intentionally used fraudulent devices for the purpose of enabling First Jersey to charge excessive markups, knowing they were violating the law. Defendants do not challenge the court's findings of fact. (First Jersey brief on appeal at 5 ("We ... will assume that those factual findings were not clearly erroneous....").) Hence, for purposes of this appeal, defendants have conceded that they failed to make disclosures of facts that would have been important to their customers; that their nondisclosures were intended to, and did, defraud their customers; and that these intentional frauds were designed to facilitate the markups that they charged.

Defendants argue instead that the misrepresentations and omissions found by the court were legally irrelevant to the matter of whether or not their markups were excessive and to the relief granted and that their markups were not excessive. We disagree.

It has long been recognized that the character of the market for a given security is relevant in determining the application of §§ 17(a) and 10(b), and that a broker-dealer who creates a market in securities and sells the securities to its customers without disclosing the nature of that market violates those provisions. "It is of utmost materiality to a buyer ... to know that he may not assume that the prices he pays were reached in a free market; and the manipulator cannot make sales not accompanied by disclosures of

his activities without committing fraud." *Halsey, Stuart & Co.*, 30 S.E.C. 106, 112 (1949). In *Norris & Hirshberg, Inc. v. SEC*, 177 F.2d 228, 232–33 (D.C.Cir.1949), for example, the court found substantial evidence to support the SEC's finding that a broker-dealer violated §§ 17(a) and 10(b) when it failed to disclose to customers its general practice of acquiring large portions of the available issues of unlisted securities, selling them to its customers, buying them back, and then reselling them to the same and other customers. The SEC had concluded that the firm's manner of trading allowed it to fix the prices of the securities in a market largely unaffected by competition and that the non-competitive nature of the market in which the securities were traded was a material fact that the firm had an obligation to reveal to its clients:

> Each of [the broker-dealer's] sales carried with it the clear—though implied—representation that the price was reasonably related to that prevailing in an open market.... Without disclosure fully revealing that the 'market' was an internal system created, controlled, and dominated by the [broker-dealer] that representation was materially false and misleading.

*Norris & Hirshberg, Inc.*, 21 S.E.C. 865, 882 (1946), *aff'd*, 177 F.2d 228 (D.C.Cir.1949); *see also Richard J. Puccio*, 59 S.E.C. Docket 1985, 1995 WL 419347, at *3 (July 10, 1995) (holding that broker violated the antifraud provisions by, *inter alia*, "crossing" customer orders or inducing one set of customers to purchase stocks sold by another set of customers without informing the first set of customers that he recommended the securities simply to find a buyer for the selling customers' securities); *S.T. Jackson & Co.*, 36 S.E.C. 631, 656 (1950) (finding that broker-dealers committed securities fraud by, *inter alia*, failing to advise clients that market for stock was "artificial, having been created and controlled by [the broker-dealers] for the purpose of profitably disposing of stock which they held or were to acquire").

When First Jersey repurchased the units at issue here and sold their component securities to its retail customers without disclosing either the fact that it created and maintained the markets for those securities or the nature of its sales practices, the Firm impliedly represented that the prices paid for those securities reflected their value in a competitive market. In fact, the market was created almost entirely by First Jersey's own activity, and the district court found that First Jersey's failure to disclose to customers of its respective branches that it was buying units cheaply from one set of customers and reselling at a 100–150% markup to another set of customers defrauded both groups of customers. First Jersey preserved its customers' ignorance of market conditions in part by maintaining the ignorance of its own sales representatives: sales personnel were provided with a sales script for the recommended securities and were discouraged from conducting independent research before selling a security. Customers who purchased component securities were never informed that the securities had been issued in units, nor were they advised of the sale or purchase price of the units or provided with a prospectus for the unit offering. The record well supports the district court's finding that the intentional nondisclosures allowed the Firm to manipulate the market for the securities and to gain substantial profits for itself while depriving its customers of the ability to make an informed decision about the purchase or sale of the securities.

Accordingly, we reject defendants' contention that the court's first conclusion as to liability was irrelevant to the question of excessive markups. The fraudulent nondisclosures facilitated First Jersey's manipulation of the market and allowed the Firm to charge markups that were excessive.

### B. *First Jersey's Excessive Markups*

In challenging the district court's ruling that the markups they charged were excessive, defendants contend that the court misunderstood both the role of a market maker in a security and the concept of liquidity, and that it therefore erred in looking to the retail prices at which First Jersey purchased units in order to determine the reasonableness of the markups in its resale of the components. We are unpersuaded.

Sales of securities by broker-dealers to their customers carry with them an implied representation that the prices charged in those transactions are reasonably related to the prices charged in an open and competitive market. *See, e.g., Charles Hughes & Co. v. SEC,* 139 F.2d 434, 437 (2d Cir.1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944); *SEC v. Resch–Cassin & Co.,* 362 F.Supp. 964, 978 (S.D.N.Y.1973). Hence, a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws. *See Alstead, Dempsey & Co.,* 47 S.E.C. 1034, 1035 (1984); *see generally Norris & Hirshberg, Inc. v. SEC,* 177 F.2d at 232–33.

A markup is the difference between the retail price and the "prevailing market price" of the security. A securities firm that acts as a dealer is entitled to charge a reasonable markup on the wholesale price it pays for the security; under NASD rules, a reasonable markup is generally not more than 5% over the prevailing market price. *See First Independence Group, Inc. v. SEC,* 37 F.3d 30, 32 (2d Cir.1994) (citing NASD Rules, Section 4, Interpretation of the Board of Governors–NASD Markup Policy). An undisclosed markup of more than 10% above the prevailing market price has been held to constitute fraud *per se. See, e.g., Powell & Associates,* 47 S.E.C. 746, 748 (1982). In defining the prevailing market price of a security for purposes of calculating a dealer's markup, the SEC distinguishes between dealers who are market makers and those who are not, between markets that are competitive and those that are not, and between controlling dealers that make significant purchases in the interdealer market and those that do not.

A market maker in a security is defined in the 1934 Act as a broker-dealer that holds itself out in the interdealer market as being ready to purchase and sell that security for its own account on a regular and continuous basis. *See* 15 U.S.C. § 78c(a)(38) (1994). For market makers, markups in the security "may be computed on the basis of the contemporaneous prices *charged by* the firm or other market makers in actual sales to other dealers or, if no such prices are available, on 'the basis of representative *asked* quotations." *Alstead, Dempsey & Co.,* 47 S.E.C. at 1036 (emphases added).

If a broker-dealer is not a market maker, the best evidence of a security's prevailing market price is generally the price at which dealers in a security trade with one another, *i.e.,* the "wholesale" price. *See generally Orkin v. SEC,* 31 F.3d 1056, 1063–64 (11th Cir.1994); *F.B. Horner & Associates v. SEC,* 994 F.2d 61, 63 (2d Cir.1993) (per curiam); *Barnett v. United States,* 319 F.2d 340, 344 (8th Cir.1963). If the market for the security is competitive, the markup may be determined on the basis of the prices that other broker-dealers quote; where, however, a dealer controls or dominates the market, the best evidence of the security's prevailing market price is the price the controlling or dominating dealer actually paid. *See Robert B. Orkin,* 51 S.E.C. 336, 340 (1993) (where market is dominated and controlled by dealer, prices paid by others are not best measure of prevailing market value), *aff'd,* 31 F.3d 1056 (11th Cir.1994).

To determine whether a firm dominated the market for a particular security, the Commission considers a number of factors, including (1) whether the firm was an underwriter of the initial public offering of the security and sold a substantial percentage of the offering to its own customers; (2) whether the firm was a market maker in the secondary market for the stock and traded a significant amount of the volume in the secondary market; and (3) the number of other market makers in the stock and their percent of total trading volume as compared to the trading volume of the firm in question. *See Meyer Blinder,* 50 S.E.C. 1215, 1218 n. 14 (1992). "Where a firm sells all but a small portion of an initial public offering to its own retail clients, and the remainder is fragmented among several other dealers," the underwriter normally "control[s] wholesale pricing to such an extent as to preclude an independent market from arising .... [and is] empowered to set prices arbitrarily." *George Salloum,* 59 S.E.C. Docket 39, 1995 WL 215268, at *2 (Apr. 5, 1995) (internal quota-

tion marks omitted); *see also Robert B. Orkin,* 51 S.E.C. at 337 (where broker-dealer "effected the vast majority of the retail trades and executed most of the few wholesale trades that occurred," the broker-dealer dominated market for security).

If a controlling dealer makes few or no purchases in the interdealer market, or if the volume of trading among dealers is insignificant in comparison to the controlling dealer's retail trades, the best evidence of that security's prevailing market price is generally the retail market price that the dealer paid. *See Meyer Blinder,* 50 S.E.C. at 1224 n. 38; *see George Salloum,* 59 S.E.C. Docket 39, 1995 WL 215268, at *3. In *George Salloum,* for example, the SEC found insignificant a dealer's purchases on the wholesale market in determining prevailing market price where the dealer acquired, as to one security, 546,900 shares of stock from its customers for resale and only 18,100 shares wholesale from other dealers, and, as to a second security, 250,000 shares of stock from its customers and only 13,600 shares from dealers. The Commission found that, because the dealer had "manipulat[ed] ... the markets for these securities and ... the volume of the shares acquired [from its retail customers] was so significant" that the best evidence of the prevailing market price for the securities was the price that the dealer paid to its customers, adjusted by an imputed markdown of 10%. *Id.* at *3–4; *cf. Meyer Blinder,* 50 S.E.C. at 1224 n. 38 ("We believe that actual purchases from retail customers, adjusted for the markdowns charged, are far more probative evidence of the prevailing market price for an integrated dealer that dominates and controls the market for a security because they indicate the price the market maker is willing to pay for the security."); *W.T. Anderson Co.,* 39 S.E.C. 630, 636–37 (1960) (using retail purchases to establish prevailing market price where dealer's sale and repurchase from customers "creat[ed] whatever market existed in the[ ] stocks except for a few transactions by other brokers in [one disputed] stock").

In the present case, we conclude that the district court correctly found that First Jersey was not a market maker with regard to the subject securities. The Firm did not hold itself out in the interdealer market as ready to purchase these securities at a particular price; to the contrary, the evidence presented at trial showed that First Jersey made only minor purchases of the securities on the interdealer market, conducting the vast majority of its transactions with its retail customers.

The district court also correctly concluded that First Jersey dominated and controlled the markets in the six securities at issue here. First Jersey acted as the sole underwriter of the initial units of those securities, the majority of which were sold by the Firm to its own customers. For example, in the November 1982 underwriting of and transactions in Sovereign securities, described in Part I.B. above, First Jersey was the underwriter for the public offering of 1,100,000 units, each of which included three shares of stock; First Jersey actually sold some 1,700,000 units to its customers; it repurchased 1,300,000 of the units, and after splitting the units into their components, it resold approximately 3,000,000 shares of Sovereign common stock from the split units to another group of its customers. The court's finding that First Jersey's control over the market for Sovereign securities was nearly complete was amply supported not only by these massive sales to the Firm's own customers but also by the dearth of trades between the Firm and other dealers or among other dealers *inter sese.* In contrast to its trading in millions of units and shares with its own customers, First Jersey sold only 1,000 shares of Sovereign common stock to other broker-dealers; First Jersey made no purchases of Sovereign stock in the interdealer market. As for other broker-dealers, between November 19 and December 1, 1982, the "pink sheets," *i.e.,* NASD's published interdealer quotation lists showing prices bid by broker-dealers wishing to purchase a particular security and prices asked by broker-dealers wishing to sell, listed only two broker-dealers with respect to the Sovereign common stock and only one with respect to the Sovereign units. The dealer listed for the Sovereign stock sold only 9,300 shares. The dealer listed for the units quoted no

price, and no Sovereign units were purchased or sold by any broker-dealer other than First Jersey. In the period following the initial offering of the Sovereign units, therefore, First Jersey controlled 100% of the "buy" side and 99.7% of the "sell" side of the Sovereign common-stock market. The trial evidence showed a similar pattern with respect to the other securities at issue in this litigation. Because as to these securities First Jersey was not a market maker but dominated the market for these securities, and there were few or no trades either with or among other dealers, the district court, in determining their prevailing prices and calculating First Jersey's markups, correctly relied on the prices the Firm actually paid its customers to acquire the securities.

We are not persuaded by defendants' contention that the court erred in looking to the prices First Jersey paid for the units as evidence of the market value of the component securities because the prices of the units reflected a discount due to their illiquidity. Defendants' own expert acknowledged that since First Jersey had the sole power to repurchase and unbundle the units, it unilaterally determined their liquidity. First Jersey could thus determine, without consideration of a competitive market price, the price at which the securities were bought and sold. The district court found further that defendants never considered the liquidity of the units in underwriting the units, repurchasing the units, or selling their component securities, and indeed found that even prior to the date of the public offering it was First Jersey's plan to repurchase shortly after the offering, promptly unbundle, and resell at huge markups. The court was entitled to infer that the price of the units reflected First Jersey's domination and control over the market for the securities, and not a discount reflecting illiquidity.

▮ In sum, we see no error in the district court's findings that First Jersey sold securities to its customers at prices that included excessive markups, that it was able to do so in part because of its nondisclosures to customers as to the nature of the market and the Firm's control of the market, and that the purpose of the nondisclosures was to facilitate the excessive markups. The district court correctly concluded that this conduct violated §§ 17(a) and 10(b) and Rule 10b–5.

## C. Brennan's Personal Liability

In addition to disputing the liability of the Firm itself, Brennan contends that even if First Jersey committed fraud, he should not have been held personally liable for any violation, either as a primary violator of the securities law or as a controlling person under § 20(a) of the 1934 Act. We disagree.

### 1. Primary Liability

▮ "Any person or entity ... who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under [federal securities law], assuming all of the requirements for primary liability ... are met." *Central Bank v. First Interstate Bank,* 511 U.S. 164, 191, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994) (emphasis omitted). Primary liability may be imposed "not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994).

▮ The evidence presented at trial sufficed to establish that Brennan had knowledge of First Jersey's frauds and participated in the fraudulent scheme. The district court found that "the whole point of the scheme" undertaken here, 890 F.Supp. at 1195, which required some branches to purchase and others to resell, and forbade each group to talk to the other, was to keep customers in the dark, and was coordinated from First Jersey headquarters. The magnitude of First Jersey's scheme and the degree of oversight needed to coordinate the activities carried out by dozens of branch offices throughout the United States, and hundreds, if not thousands, of sales representatives, supports the district court's determination that the illegal activity could only have occurred at the direction of First Jersey's upper-level management. The court found that Brennan was engaged in the purposeful plan-

ning of the pattern and repeated format of trading in which the respective branch offices engaged and that he "orchestrated every facet of First Jersey's branch office network." 890 F.Supp. at 1195.

These findings are permissible inferences from the evidence, much of it from Brennan's own testimony, as to Brennan's stake and active role in the Firm. He was sole owner. Throughout the relevant period, he was a director and was either its president or its chief executive officer. In addition to receiving after-the-fact reports on the various securities sold by the branch offices, Brennan, *inter alia*, chose which securities First Jersey underwrote, was generally consulted before the units were split into their component parts, had a large measure of control over the "home office," which established the Firm's sales policies, and regularly consulted with heads of the Firm's six departments, including First Jersey's head trader, who priced the securities sold by the Firm.

Brennan's reliance on *Universal Heritage Investments Corp.*, 47 S.E.C. 839 (1982), for the proposition that only supervisory, and not primary, liability, should have been imposed on him is misplaced. *Universal Heritage* involved a finding that one branch of a brokerage firm had engaged in unlawful activity, and the SEC ruled that the firm's executive vice president was not primarily liable because, though he was responsible for the daily operation of the firm, there was insufficient evidence that he was actually aware of the misconduct of the branch office in question, and hence there was an insufficient basis for a finding that he had "intentional[ly] and knowing[ly] acquiesce[d]" in the illegal activity. *Id.* at 844. The findings in the present case that Brennan was aware of and "was intimately involved in" the decisions as to unit-splitting and pricing, 890 F.Supp. at 1201, and that he orchestrated First Jersey's balkanization of its branches in order to keep customers in the dark, are supported by the record and distinguish this case from *Universal Heritage* and other cases in which an individual escaped primary liability.

In light of the evidence presented at trial with regard to Brennan's hands-on involvement in the pertinent decisions, we conclude that the trial court did not err in finding that Brennan knowingly participated in First Jersey's illegal activity and that he should be held primarily liable for its violations of the securities laws.

### 2. *Controlling Person Liability*

Even if Brennan were not to be held primarily liable for his participation in First Jersey's fraudulent activity, the district court properly ruled that he was liable for violations of § 10(b) and Rule 10b–5 as a controlling person under § 20(a) of the 1934 Act. Section 20(a) provides that

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. Since § 20(a) is available as an enforcement mechanism to "any person to whom such controlled person is liable," and the 1934 Act includes government agencies in the definition of "person," *see* 15 U.S.C. § 78c(a)(9), we have upheld the SEC's authority to pursue an enforcement action under § 20(a). *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975). *Contra SEC v. Coffey*, 493 F.2d 1304, 1318 (6th Cir.1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, *see Marbury Management, Inc. v. Kohn*, 629 F.2d at 715–16, and show that the controlling person was " 'in some meaningful sense [a] culpable participant[ ] in the fraud perpetrated by [the] controlled person[ ],' " *Gordon v. Burr*, 506 F.2d 1080, 1085 (2d Cir.1974) (quoting *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973) (en banc)). Control over a primary violator may be established by show-

ing that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2.

■ Once the plaintiff makes out a prima facie case of § 20(a) liability, the burden shifts to the defendant to show that he acted in good faith, *see Marbury Management, Inc. v. Kohn,* 629 F.2d at 716; *Gordon v. Burr,* 506 F.2d at 1086, and that he "did not directly or indirectly induce the act or acts constituting the violation," 15 U.S.C. § 78t. To meet the burden of establishing good faith, the controlling person must prove that he exercised due care in his supervision of the violator's activities in that he "maintained and enforced a reasonable and proper system of supervision and internal control[s]." *Marbury Management, Inc. v. Kohn,* 629 F.2d at 716.

As discussed in Part III.A. and B. above, the district court properly found that First Jersey violated the 1934 Act; and for the reasons discussed in Part III.C.1. above, there can be no question that Brennan was a controlling person with respect to First Jersey. Hence, in order to escape controlling-person liability, Brennan had the burden of showing that he did not induce the Firm's violations and that he maintained and enforced a reasonable and proper system of supervision and internal control over the pertinent personnel. The district court permissibly found that he did not carry that burden.

In an effort to show that First Jersey had in place internal procedures for assuring compliance with price markup rules established by the SEC and NASD during the pertinent period, defendants presented the testimony of Frederick A. Eyerman, First Jersey's vice president in charge of compliance. Eyerman stated that the markups on First Jersey's principal sales to its customers were established by the Firm's trading department. The compliance department reviewed the Firm's trades by looking at the interdealer quotes in the NASD pink sheets. But Eyerman acknowledged that First Jersey's procedures did not require the Firm to calculate markups for securities for which it controlled the market any differently from the way it calculated markups for securities for which the Firm did not control the market. Eyerman further testified that in order to determine whether the Firm was complying with industry regulations, he looked for "red flags," such as large differences between the Firm's acquisition price of a security and the price the Firm charged to its customers for the security. But he conceded that he did not look at all sales and that he determined the Firm's acquisition cost for a security by looking only at transactions that occurred on the very day the Firm sold the security. Needless to say, given that there were virtually no trades other than those conducted by First Jersey, and that First Jersey's resales occurred a few days after its repurchases, Eyerman's measurement of the Firm's markup on a given day by looking only at sales that occurred on that day left him unable to detect any discrepancies. This pattern of conduct amply justified the district court's conclusion that First Jersey's purported compliance efforts were more cosmetic than real.

Further, with respect to First Jersey's dealings with its customers, the record showed that the Firm gave its sales representatives little information about proper procedures or about the securities they were hawking. Former First Jersey salespersons testified, for example, that training manuals typically did not contain information about the risks inherent in the type of securities sold by First Jersey and, in any event, the manuals were not distributed to all sales personnel. The registered representatives were not permitted to do research on their own; there was no published information on the securities in question. Nor were they allowed, without permission from the branch manager, to contact the Firm's research department for information. Rather, they were scripted on what to say. The court found that "[v]irtually all of the twelve former First Jersey salesm[e]n who testified for the SEC described the 'script'." 890 F.Supp. at 1189. The branch manager would come out of his office and tell the sales representatives to clear their telephones so that they could hear and write down the script verbatim. The

message "was repeated several times until we had it correct in our notes." *Id.* at 1190 (quoting a former First Jersey salesman). The information, taking up 1–1½ pages on a legal pad, was basically the same for every stock. " '[T]hey all started the same way. I mean, he gave us, you know, spectacular turnaround situation, was a line that was almost in every presentation.' " *Id.* at 1189 (quoting a former First Jersey salesman).

A number of former First Jersey sales representatives further testified that the Firm periodically distributed questionnaires to sales personnel, ostensibly to provide the Firm's management with information concerning compliance with industry rules and regulations. However, the completed questionnaires with regard to the Firm's practices were replete with misinformation that was at times provided by management itself. For example, the questionnaire asked whether First Jersey always required sales representatives to learn their customers' financial objectives and circumstances prior to making any purchase or sale recommendation, and a former branch manager testified that that question was never answered in the negative *Id.* at 1202 n. 25. In fact, however, the Firm imposed no such requirement. It did not advise sales representatives as to the appropriate length of time a security should be held by a customer, or about the mix of securities appropriate to customers with certain income levels and financial needs, and it did not instruct its salespersons to make any inquiries designed to determine whether the recommended security was suitable to the needs or financial condition of that customer.

The district court's findings that First Jersey's training and compliance methods were not bona fide attempts to comply with the securities laws were a permissible view of the evidence, and hence are not clearly erroneous, *see Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Given these findings, together with the findings as to Brennan's hands-on management and his role in orchestrating the Firm's unlawful acts, the court properly concluded that

Brennan failed to carry his burden of showing a good faith effort to discharge his responsibilities.

## IV. REMEDIES

Defendants challenge all aspects of the relief ordered by the district court. They contend principally that the injunction and order of disgorgement were improper because the SEC failed to prove that such relief is necessary to prevent future violations; in addition, Brennan contends that he should not be held liable for the full amount of the disgorgement ordered. Defendants also contend that the award of prejudgment interest was unjustified and that the appointment of a Special Agent was impermissible. We find merit only in the challenge to the appointment of the Special Agent.

### A. *Disgorgement*

Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits. *See, e.g., SEC v. Lorin,* 76 F.3d 458, 461–62 (2d Cir.1996) (per curiam); *SEC v. Patel,* 61 F.3d 137, 139 (2d Cir.1995); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1104 (2d Cir.1972). The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws. *See, e.g., SEC v. Wang,* 944 F.2d 80, 85 (2d Cir.1991); *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 102 (2d Cir.1978). "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d at 1104; *see SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.1971) ("It would severely defeat the purposes of the Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation.").

The district court has broad discretion not only in determining whether or

not to order disgorgement but also in calculating the amount to be disgorged. *See, e.g., SEC v. Lorin,* 76 F.3d at 462. The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation," *SEC v. Patel,* 61 F.3d at 139 (internal quotation marks omitted); "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty," *id.* at 140 (internal quotation marks omitted). We review the district court's order of disgorgement for abuse of discretion. *See, e.g., SEC v. Posner,* 16 F.3d 520, 522 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995).

Defendants, relying on *United States v. Carson,* 52 F.3d 1173 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 934, 133 L.Ed.2d 861 (1996), argue that disgorgement was not proper here because the SEC did not show that that relief was necessary to prevent future violations. Even assuming the validity of defendants' premise, their reliance on *Carson* is misplaced. *Carson* was a case brought under the Racketeer Influenced and Corrupt Organizations Statute ("RICO"), 18 U.S.C. § 1961 *et seq.* (1994), which states that "[t]he district courts ... shall have jurisdiction" to impose civil penalties such as divestiture in order "to prevent and restrain violations of [RICO]," *id.* § 1964(a). In light of that language and the "forward looking" examples given in that jurisdictional section, we held that a divestiture order under RICO must be designed to prevent future conduct rather than to remedy past wrongdoing. *See* 52 F.3d at 1181–82. The analysis in *Carson* is inapposite here, since the primary purpose of disgorgement as a remedy for federal securities laws violation is deterrence, through prevention of unjust enrichment on the part of the violator.

Defendants also contend that disgorgement is not needed to reimburse defrauded customers because defendants settled a class action, without objection by the SEC, brought by and on behalf of those customers. This argument too is wide of the mark. Since disgorgement is a method of forcing a defendant to give up the amount by which he was unjustly enriched, it is unlike an award of damages, *see, e.g., SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d at 102, and is neither foreclosed nor confined by an amount for which injured parties were willing to settle. A settlement payment may properly, however, be taken into account by the court in calculating the amount to be disgorged, and the district court did so here. It acknowledged the $5 million that defendants paid in settlement of the class action but found that the unlawful profits gained by defendants in the six securities at issue here exceeded $27 million. It was well within the court's discretion to give defendants credit for the $5 million paid out to reimburse victims of their frauds and to require defendants to disgorge the rest of those profits. We also conclude that the amount of disgorgement ordered is a reasonable approximation of First Jersey's unlawful profits from its fraudulent transactions and is not punitive in nature.

Brennan contends that the district court erred in making him jointly and severally liable for disgorgement of the total amount of First Jersey's profits and should not have ordered him to disgorge more than the profits he personally received from the transactions in question. We conclude that that order too was within the court's discretion. As discussed in the previous sections, Brennan is primarily liable for the frauds at issue here, having been "intimately involved" in their perpetration, and is also liable as a controlling person of First Jersey. Under the express terms of § 20(a), a controlling person who has failed to establish his good-faith defense is to be held "liable jointly and severally with and to the same extent as" the controlled person. 15 U.S.C. § 78t. Accordingly, where a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations, and where the trial court has, within the proper bounds of discretion, determined that an order of disgorgement of those gains is appropriate, it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order. *See, e.g., Hateley v. SEC,* 8 F.3d 653, 656 (9th

Cir.1993) (affirming disgorgement order imposed jointly and severally against broker-dealer securities firm, its president, and its executive vice-president for violations of NASD rules where defendants "acted collectively in violating the association's rules and because of the close relationship among the three of them"); *see also SEC v. Hughes Capital Corp.*, 917 F.Supp. 1080, 1088 (D.N.J. 1996) (finding joint and several liability of corporation and individual defendants because all were "knowing participants who acted closely and collectively").

Brennan's contention that he should be required to disgorge only amounts that he withdrew from the Firm might be more persuasive if he had owned less than all of First Jersey's stock. But he was the Firm's sole owner; not surprisingly, he testified at trial that he could request a check in any amount at any time and the Firm would issue one to him. As he owned 100% of the Firm, to the extent that the Firm's net worth was increased by its unlawful activities, so was Brennan's personal wealth.

No more than the total amount of First Jersey's unlawful profits, plus interest on those amounts, is to be disgorged. We see no abuse of discretion in making Brennan individually liable for those sums, jointly and severally with the company he owns. Accordingly, we decline to overturn the order for joint and several disgorgement.

**B.** *Prejudgment Interest*

The district court ordered defendants to pay prejudgment interest totaling $52,689,894. Defendants argue that this amount is grossly disproportionate to the amount of disgorgement ($22,288,099) and was unduly inflated because the court (a) improperly used the rate employed by the Internal Revenue Service ("IRS") for an underpayment of taxes, rather than the treasury-bill rate (resulting in a difference of more than $23 million), and (b) inappropriately ordered that interest be paid for the entire 12–year period since the violations occurred notwithstanding delays that defendants attribute to the SEC. We see no abuse of discretion in the court's prejudgment interest award.

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion." *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071–72 (2d Cir.1995) (internal quotation marks omitted). In deciding whether an award of prejudgment interest is warranted, a court should consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d 831, 833–34 (2d Cir.), *cert. denied,* 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992); *see also Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 613 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance.

When the SEC itself orders disgorgement, *see* 15 U.S.C. § 78u–2(e) (1994), which as discussed above is designed to strip a wrongdoer of its unlawful gains, the interest rate it imposes is generally the IRS underpayment rate, *see, e.g.,* SEC Rules & Regulations, 60 Fed.Reg. 32738, 32788 (June 23, 1995). That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud. Accordingly, courts have approved the use of the IRS underpayment rate in connection with disgorgement. *See SEC v. Drexel Burnham Lambert, Inc.,* 837 F.Supp. 587, 612 n. 8 (S.D.N.Y.1993) (citing cases), *aff'd,* 16 F.3d 520 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995).

Though defendants urge that the treasury-bill rate of interest should have been used instead, that is the rate at which one lends money to the government rather than borrows money from it. That advantageous rate

would seem highly inappropriate in the circumstances here, where defendants have had the use of the money.

 Nor are we persuaded that it was inappropriate to order that prejudgment interest be paid for the entire period from the time of defendants' unlawful gains to the entry of judgment. Even if defendants were correct that the present litigation was protracted through some fault of the SEC, defendants plainly had the use of their unlawful profits for the entire period, except for $5 million paid to settle the class action, on which, as discussed above, the court did not include interest for the period subsequent to payment. Given the remedial purpose of the statute, the goal of depriving culpable defendants of their unlawful gains, and the lack of any unfairness to defendants, we see no abuse of discretion in the court's order.

## C. The Permanent Injunction

 We also reject as meritless defendants' contention that the district court erred in permanently enjoining them from future violations of § 17(a), § 10(b), and Rule 10b–5. An injunction prohibiting a party from violating statutory provisions is appropriate where "there is a likelihood that, unless enjoined, the violations will continue." *Commodity Futures Trading Commission v. American Board of Trade, Inc.*, 803 F.2d 1242, 1250–51 (2d Cir.1986); *see also SEC v. Posner*, 16 F.3d at 521–22. Such an injunction is particularly within the court's discretion where a violation was "founded on systematic wrongdoing, rather than an isolated occurrence," *United States v. Carson*, 52 F.3d at 1184 (internal quotation marks omitted), and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted, since "persistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of an injunction." *SEC v. Lorin*, 76 F.3d at 461 (internal quotation marks omitted); *see also SEC v. Posner*, 16 F.3d at 521 (where defendants violated securities laws with "high degree of scienter" and failed to assure court

that future violations were not likely to recur, injunction was warranted).

In determining that a permanent injunction was warranted in the present case, the district court noted that First Jersey continued to be a broker-dealer owned by Brennan and that it employed a number of key personnel who worked at First Jersey between 1982 and 1985. Brennan himself has remained an active participant in the securities markets. *See, e.g., Hibbard, Brown & Co.*, 58 S.E.C. Docket 2561, 1995 WL 116488, at *1 (Mar. 13, 1995) (describing Brennan's purchase in 1991 of 1,450,000 units of securities). The district court also noted that First Jersey and Brennan had a history of engaging in activities that led to misconduct charges, followed by sanctions imposed by various regulatory agencies or courts, followed by new misconduct charges. Thus, the record showed, *inter alia*, that for a month in 1973, Brennan was suspended from the sale of mutual funds by the New Jersey Bureau of Securities. In 1974, Anthony Nadino, Brennan's brother-in-law and First Jersey's head trader at all times relevant to this case, was federally enjoined from further violations of the antifraud provisions of the securities laws based on his promulgation of false and misleading quotations and manipulation of the market while employed at another broker-dealer prior to coming to First Jersey. *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 810–11, 814 (2d Cir.1975). In 1984, in settlement of the SEC's 1979 Proceeding and its Geosearch action, defendants were enjoined against engaging in certain transactions with regard to securities underwritten by First Jersey and a special consultant was appointed to monitor the Firm's practices. In 1986, NASD commenced and settled a proceeding entitled *Market Surveillance Committee v. First Jersey Securities, Inc., Robert E. Brennan, and Anthony Nadino*, Complaint No. MS–261 (Feb. 7. 1986), concerning markups in Trans Net warrants; First Jersey, Nadino, and Brennan were censured, First Jersey was fined $300,000, and Nadino and Brennan were fined $25,000 each and suspended for 10 days from association with any NASD member. In 1990, NASD commenced and settled a proceeding entitled *District Business Conduct Committee v.*

*First Jersey Securities, Inc., Robert E. Brennan, John E. Dell, Frederick A. Eyerman, et al.,* Complaint No. NEW–619 (Sept. 24, 1990), concerning violations of the NASD's Rules of Fair Practice, in which First Jersey was fined $50,000 and Brennan *et al.* were censured.

The district court also observed that Brennan, whose trial testimony the court characterized as "belligerent[ly] evasive[ ]," 890 F.Supp. at 1207, took the position in the present case that defendants had done nothing wrong and that if there had been any violations they were merely accidental. In light of defendants' disciplinary record, their deliberate and systematic frauds in the present case, and their continued protestations of innocence, it was well within the discretion of the district court to conclude that permanent injunctive relief is warranted.

### D. *The Appointment of a Special Agent*

 Finally, defendants challenge that part of the judgment which provided for the appointment of a Special Agent to determine whether, during the period between 1982 and 1987, First Jersey engaged in fraudulent activity beyond that proved at trial. The district court, in its opinion, stated that it was convinced that the violations pleaded and proven with respect to the six securities at issue in the present litigation were but "the tip of the iceberg." 890 F.Supp. at 1212. Citing its general equity powers, the court stated that a Special Agent would therefore be appointed to investigate the possibility that, in 1982–1987, First Jersey had committed additional violations of the securities laws that the SEC had not pleaded or proven. The Special Agent would be directed, in the event that he found excessive markups or markdowns, to "recommend to the Court that defendants disgorge and pay over, as the Court may direct, all illegally-obtained profits." 890 F.Supp. at 1213. The final judgment stated that the Special Agent would be appointed thereafter, with his powers and duties delineated in a subsequent order. We find merit in defendants' challenge to this part of the judgment.

Section 21(a) of the 1934 Act gives the SEC authority to

make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of [the securities laws], the rules and regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member. . . .

15 U.S.C. § 78u(a)(1). The Commission is given limited authority to delegate these investigatory powers; § 4(b) allows it to "appoint . . . such officers, attorneys, examiners, and other experts as may be necessary for carrying out its functions under [the securities laws]." *Id.* § 78d(b)(1). This authority, which needed no court order for its exercise, provides no basis for the appointment of the Special Agent envisioned by the judgment in this case, for the agent was not to be one appointed by the SEC, but one appointed by the court.

 The court itself, of course, has authority to make appointments of special personnel to assist in the court's judicial functions, such as special masters to assist in the adjudication of complicated factual issues, *see* Fed.R.Civ.P. 53, or trustees to oversee compliance with the court's final judgment, *see, e.g., SEC v. S & P National Corp.,* 360 F.2d 741, 750 (2d Cir.1966). The appointment of a Special Agent in this case, however, is not for the purpose of assisting in adjudication of a case before the court. Though the SEC argues that appointment of the Special Agent is appropriate because his appointment "is merely a mechanism to assist the court in ascertaining the appropriate amount of disgorgement" (SEC brief on appeal at 49), this argument disregards the fact that the claims brought by the SEC in this case have now been adjudicated, and the appropriate amount of disgorgement to deprive defendants of the unlawful gains from the transactions pleaded and proven in this litigation has been determined. Disgorgement is permissible relief for a valid claim of violation of the securities laws; but disgorgement is not a claim in itself. *See generally Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 69, 112 S.Ct. 1028, 1034, 117 L.Ed.2d 208 (1992) (The " 'question whether a litigant has a "cause of action" is analytically distinct

[from] and prior to the question of what relief, if any, a litigant may be entitled to receive.'") (quoting *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979)). We do not regard the appointment of an investigator, whose instructions are to unearth claims not previously pursued by the SEC, as ancillary to the adjudication that has been completed.

Nor is the appointment in this case for the purpose of ensuring compliance with the court's judgment. The Special Agent's role, as described by the district court, is not to ensure that defendants' comply with the terms of the permanent injunction in the future. Rather, his role is purely retrospective and investigative. While the court indisputably has some inherent power to make appointments ancillary to its judicial function, we cannot conclude that the investigation of past acts with a view to the recommendation of new charges is a judicial function. Nor can we have confidence that the appointment of an agent to pursue such an investigation would, with respect to any recommended charges resulting from the investigation, preserve for the court the appearance of impartiality.

 The parties to an action may themselves agree, of course, subject to court approval, that a special officer is to be appointed to make such investigations. *See, e.g., Handler v. SEC*, 610 F.2d 656, 659–60 (9th Cir.1979). But we are not aware of any case, other than one in which a judgment has been entered on consent, in which an investigative agent has been appointed by the court for the purpose of unearthing past wrongs in addition to those encompassed by the pleadings and proven at trial and recommending new charges to the court. *See id.* at 659 (emphasizing that "the district court did not impose special counsel upon" the corporation).

In sum, though "if a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief," *Franklin v. Gwinnett County Public Schools*, 503 U.S. at 69, 112 S.Ct. at 1034, we do not regard the appointment of an investigator to determine whether or not the plaintiff had an additional right of action as either appropriate relief for the rights asserted or a proper exercise of the judicial function. Accordingly, we reverse so much of the court's judgment as appointed the Special Agent.

## CONCLUSION

We have considered all of defendants' contentions on this appeal and, except to the extent indicated above, have found them to be without merit. So much of the judgment as appointed a Special Agent is reversed. In all other respects, the judgment of the district court is affirmed.