**In re: CARTER–WALLACE, INC. SECURITIES LITIGATION**

**Eugene Honeyman, individually and on behalf of all others similarly situated, Consolidated–Plaintiff–Appellant,**

**Joan T. Brunjes, on behalf of herself and all others similarly situated, Plaintiff–Appellant,**

v.

**Henry H. Hoyt, Jr.; Daniel J. Black; Paul A. Veteri; Carter–Wallace, Inc., Defendants–Appellees,**

**Joseph S. Harun, Consolidated–Defendant–Appellee.**

**Docket No. 99–9475**

United States Court of Appeals, Second Circuit.

Argued June 6, 2000

Decided: Aug. 7, 2000

Richard J. Kilsheimer, New York City (Frederic S. Fox, Joel B. Strauss, Kaplan, Kilsheimer & Fox, New York City), David J. Bershad, William C. Fredericks, Milberg Weiss Bershad Hynes & Lerach, New York City, Co-Lead Counsel for Appellants.

Joseph H. Weiss, Weiss & Yourman, New York City, Jules Brody, Stull, Stull & Brody, New York City, for Appellants.

Eric M. Nelson, New York City (Matthew D. Griffin, Whitman Breed Abbott & Morgan, New York City, of counsel), for Appellees.

Before: MESKILL and WALKER, Circuit Judges, and HADEN, District Judge.*

MESKILL, Circuit Judge:

Appellants Joan T. Brunjes and Eugene Honeyman, co-lead plaintiffs in this securities fraud class action, appeal the dismissal of their claim pursuant to Fed.R.Civ.P. 12(c). *See In re Carter–Wallace, Inc. Sec. Litig.*, No. 94 Civ. 5704, 1999 WL 1029713, at *3–6 (S.D.N.Y. Nov.10, 1999). The appellants alleged that defendants-appellees Carter–Wallace, Inc., and members of its Board of Directors (collectively "Carter–Wallace") violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by running advertisements in medical journals stating that Carter–Wallace's new epilepsy drug, Felbatol, had an "unprecedented safety profile" and that "no life-threatening liver toxicities or blood dyscrasias have been attributed to Felbatol monotherapy," even though Carter–Wallace was aware of medical reports that some patients using Felbatol had developed severe or fatal illnesses. On remand from an earlier appeal, *In re Carter–Wallace, Inc. Sec. Litig.*, 150 F.3d 153 (2d Cir.1998) (*Carter–Wallace I*), the United

---

\* Honorable Charles H. Haden II, Chief Judge of the United States District Court for the Southern District of West Virginia, sitting by designation.

States District Court for the Southern District of New York, Duffy, *J.*, granted Carter–Wallace's motion to dismiss on the ground that the appellants failed to allege scienter. We agree and affirm the decision of the district court.

## BACKGROUND

On a motion to dismiss, we accept the factual allegations contained in the complaint as true. *See Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). In July 1993, Carter–Wallace's new epilepsy drug, Felbatol, was approved for sale by the Food and Drug Administration (FDA). At the time, Felbatol was considered a major advance in epilepsy treatment. It was thought to be unburdened by the risk of serious side effects, which plagued other epilepsy drugs. To promote Felbatol, Carter–Wallace ran advertisements in medical journals. A sixteen page advertisement appeared in the January 1994 issues of *Neurology* and *Archives of Neurology.* The advertisement stated that Felbatol had an "unprecedented safety profile" and that "no life-threatening liver toxicities or blood dyscrasias have been attributed to Felbatol monotherapy." The same statements were made in shorter advertisements running monthly in the same journals through July 1994.

Prior to and during the publication of the advertisements, Carter–Wallace learned that some patients taking Felbatol were developing illnesses. Pursuant to FDA regulation, drug manufacturers must relay to the FDA reports from doctors describing illnesses developed by patients using the manufacturer's product, regardless of whether there is a known or perceived causal connection between the drug and the illness. *See* 21 C.F.R. § 314.80 (1999). Among the most serious illnesses reported to Carter–Wallace was aplastic anemia, a frequently fatal form of acquired bone marrow failure. According to the complaint, from October 1993 until July 1994, Carter–Wallace received and was aware of at least fifty-seven adverse medical reports relating to Felbatol, including at least six deaths and six cases of aplastic anemia. In July 1994, Carter–Wallace received four additional reports of aplastic anemia, along with reports of other illnesses and deaths. On August 1, 1994, Carter–Wallace, in association with the FDA, sent a letter to doctors warning of an association between Felbatol and aplastic anemia. The letter recommended the immediate withdrawal of patients from treatment with Felbatol. That day, following disclosure of the letter, Carter–Wallace's common stock fell $4.875 per share, almost 33 percent, from $15.625 to $10.75 on heavy trading.

Shortly after the plunge in Carter–Wallace's stock price, two class actions were filed with Joan T. Brunjes and Eugene Honeyman serving as lead plaintiffs of classes of investors who bought stock during a period beginning January 20, 1994 and ending July 31, 1994. The class actions were consolidated into the present suit. The second amended class action complaint alleged three claims: (1) that the advertisements in the medical journals were materially false and misleading, (2) that Carter–Wallace failed to disclose information (the adverse medical reports) that made representations in its financial statements misleading, and (3) that Carter–Wallace violated Generally Accepted Accounting Principles (GAAP) by overvaluing its inventory of Felbatol when it allegedly knew that Felbatol would not be commercially viable. Carter–Wallace moved for dismissal pursuant to Fed. R.Civ.P. 12(b)(6). The district court found that the advertisements in the medical journals were not made "in connection with" the purchase or sale of securities. The district court dismissed the other claims as well, reasoning that Carter–Wallace was under no duty to disclose the adverse reports or re-value its inventory because prior to August 1, 1994 there was no statistically significant link between Felbatol and any side effect. On appeal, we affirmed the district court's dismissal of

the financial statements claim and the GAAP claim. With respect to the medical advertisement claim, however, we disagreed with the district court's determination that advertisements in medical journals could not, as a matter of law, be made "in connection with" a securities transaction. We remanded to the district court to determine, in the first instance, "whether the appellants' complaint with respect to the advertisements sufficiently alleges the other elements of a Section 10(b) claim." *Carter–Wallace I*, 150 F.3d at 157.

On remand, Carter–Wallace moved for judgment on the pleadings on the ground that the complaint had failed to allege scienter. The district court agreed and dismissed the claim.

## DISCUSSION

A district court's grant of judgment on the pleadings is reviewed *de novo*. *See Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir.1999). The standards governing this case are not disputed by the parties.[1] "[A] plaintiff must plead that 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.'" *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir.1993) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985)) (second alteration in original). "The scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud,' or knowing misconduct." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999) (quoting *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1467 (2d Cir.1996)). For purposes of its motion, Carter–Wallace has conceded all of the elements of the appellants' claim except scienter. Thus, the sole issue on appeal is whether the complaint sufficiently alleges scienter. For the reasons that follow, we conclude that it does not.

■ Fed.R.Civ.P. 9(b) requires that allegations of fraud be pled with specificity. Although Rule 9(b) raises the pleading standard in fraud cases, it provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." However, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks omitted). In order to plead scienter, we require the complaint "to allege facts that give rise to a strong inference of fraudulent intent." *Id.; see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). A "strong inference of fraudulent intent" may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128 (citing *In re Time Warner*, 9 F.3d at 268–69).

■ The appellants argued both the "conscious misbehavior" and "motive and opportunity" theories before the district court. On appeal, they have abandoned the "motive and opportunity" theory. To survive dismissal under the "conscious misbehavior" theory, the appellants must show that they alleged reckless conduct by the appellees, which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.*, 570

---

**1.** As this case was filed in August 1994, it is not subject to the Private Securities Litigation Reform Act of 1995.

F.2d 38, 47 (2d Cir.1978) (internal quotation marks and alterations omitted). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996) (internal quotation marks and alterations omitted). It is sufficient for appellants to allege "defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir.2000).

■ Appellants' theory of "conscious misbehavior" is based solely on the allegation that Carter–Wallace touted Felbatol's safety while it was receiving adverse medical reports. They argue that Carter–Wallace was recklessly, if not intentionally, perpetrating fraud by allowing the advertisements to continue when it was aware of reports that undermined the accuracy of the advertisements. Fatal to their argument, however, is our determination in *Carter–Wallace I* that the medical reports did not demonstrate a statistically significant link between Felbatol and any illness until August 1, 1994, when Carter–Wallace recommended the withdrawal of patients from Felbatol treatment.

In holding that Carter–Wallace had no duty to disclose the Felbatol-related deaths prior to August 1, 1994, we reasoned that the financial statements

> did not become materially misleading until Carter–Wallace had information that Felbatol had caused a statistically significant number of aplastic-anemia deaths and therefore had reason to believe that the commercial viability of Felbatol was threatened. Drug companies need not disclose isolated reports of illnesses suffered by users of their drugs until those reports provide statistically significant evidence that the ill effects may be caused by— rather than randomly associated with—use of the drugs and are sufficiently serious and frequent to affect future earnings. In the present case,

> ... *the [pre-July ·1994 ] reports are not by themselves sufficient to support inferences of either actual knowledge or recklessness.*

*Carter–Wallace I,* 150 F.3d at 157 (citations omitted) (emphasis added). Our determination that the reports of aplastic anemia were not statistically significant prior to August 1, 1994 is the law of this case and we will adhere to it, "absent cogent or compelling reasons." *Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.1983) (internal quotation marks omitted); *see also United States v. Adegbite,* 877 F.2d 174, 178 (2d Cir.1989) ("[W]e will generally adhere to our own earlier decision on a given issue in the same litigation."). As discussed below, we do not find any compelling reason for deviating from our prior conclusion.

■ The appellants argue that their complaint alleges that the causal connection between Felbatol and aplastic anemia was made before August 1, 1994. However, "conclusory allegations" do not satisfy the pleading requirements of Rule 9(b). *See Acito v. IMCERA Group,* 47 F.3d 47, 53 (2d Cir.1995). The appellants must provide "at least a minimal factual basis" for their allegations of scienter. *Chill,* 101 F.3d at 267 (internal quotation marks omitted). The complaint describes the adverse reports received by Carter–Wallace and concludes that the "adverse effects from Felbatol were extremely serious and the number of incidents was ... statistically unacceptable." This allegation is based, like much of the appellants' arguments, on the sheer number of adverse reports—57 before July 1994.

We do not believe that the existence or the number of such reports is problematic. FDA regulations require that all "adverse drug experience information" be reported to the FDA. 21 C.F.R. § 314.80(c) (1999). Drug manufacturers receive these reports from several sources, including treating physicians. An "adverse drug experience"

is defined broadly to include "[a]ny adverse event associated with the use of a drug in humans, *whether or not considered drug related.*" 21 C.F.R. § 314.80(a) (1999) (emphasis added); *see also* 21 C.F.R. § 314.80(k) (1999) ("A report or information submitted by an applicant under this section ... does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse effect."). Carter–Wallace received reports when patients on Felbatol became ill, regardless of whether or not the illness had anything to do with Felbatol. Contrary to the appellants' assertions throughout their complaint, the receipt of an adverse report does not in and of itself show a causal relationship between Felbatol and the illness mentioned in the report. On this record, the only illness eventually attributed to Felbatol was aplastic anemia. The other illnesses, although serious and even fatal in some instances, were never linked to Felbatol. Therefore, it was not reckless for Carter–Wallace to believe that these reports were random and statistically insignificant before August 1, 1994. The eventual linking of aplastic anemia to Felbatol cannot relate back to the time of the statements in the medical journals and reflect on Carter–Wallace's reasonable belief that the reports were random. Felbatol was a popular drug. Some adverse events may be expected to occur randomly, especially with a drug designed to treat people that are already ill. Carter–Wallace's actual awareness of adverse reports while touting Felbatol's safety does not, on its own, constitute "strong circumstantial evidence of conscious misbehavior or recklessness." The advertisements never guaranteed a total absence of unrelated illnesses. The appellants' pleading arguments, based on the same complaint we reviewed in *Carter–Wallace I,* are unpersuasive in altering our earlier opinion that the link between aplastic anemia and Felbatol was not made before August 1, 1994.

The appellants argue that our reversal of the dismissal of the medical advertisement claim in *Carter–Wallace I* supports their position. However, the portion of *Carter–Wallace I* dealing with the medical advertisements was limited to the proposition that, as a matter of law, these statements could be made "in connection with" a securities transaction. We remanded in order to develop the record, which in no way reflected on whether we believed the appellants had adequately pled the scienter element of their claim. *See Carter–Wallace I,* 150 F.3d at 156–57.

We are also unpersuaded by the appellants' argument that *Carter–Wallace I* can be distinguished on the ground that it concerned omissions, while the medical journal advertisements were affirmative statements. Actually, the GAAP claim involved an affirmative statement, namely, an overstatement of inventory, not an omission. Our reasoning in *Carter–Wallace I* applies with equal force here. There, we held that the adverse reports did not need to be disclosed in order to correct the financial statements because, until August 1, 1994, it was not reckless for Carter–Wallace to consider the adverse reports to be random. Not only were the financial statements not materially misleading before the link could be made, but any inference of scienter was negated as well. As we explained in affirming the dismissal of the GAAP claim, "no such intent can be inferred because ... Carter–Wallace had no sound reason to doubt the commercial viability of Felbatol or the value of its inventory until the reports of Felbatol-associated deaths became statistically significant." *Id.* at 157. Contrary to the appellants' argument, this reasoning is not distinguishable on the ground that it involved Felbatol's commercial viability because Felbatol's commercial success was directly tied to its safety. We do not see any basis for distinguishing *Carter–Wallace I* or deviating from our conclusion that, before August 1, 1994, the connection between Felbatol and aplastic anemia was not statistically significant.

The appellants rely on *Cosmas v. Hassett*, 886 F.2d 8 (2d Cir.1989), to argue that they have sufficiently pled scienter. *Cosmas* is readily distinguishable. In *Cosmas*, the defendants represented that sales to China would be "an important new source of revenue" even though import restrictions, of which the defendants were presumably aware, belied the statement. *Id.* at 10, 12–13. Here, by contrast, there can be no presumption that Carter–Wallace was aware of a statistically significant connection between Felbatol and aplastic anemia before August 1, 1994. This case is closer to *Shields*. In *Shields*, we explained that, even if the defendants turned out to be wrong about predicted financial performance, "misguided optimism is not a cause of action, and does not support an inference of fraud." *Shields*, 25 F.3d at 1129. We held that "nothing alleged indicates that management was promoting a fraud. People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future." *Id.; see also Chill*, 101 F.3d at 268–71 (dismissing the plaintiffs' allegations that the defendant failed to heed "red warning flags" that signaled the defendant's subsidiary's falsification of profits). Here, the early medical reports may have indicated a potential problem, but until a connection between Felbatol and any illness could be made, we would not expect Carter–Wallace to abandon its product on what, at the time, would have been speculation. The complaint here cannot support an inference that Carter–Wallace turned a blind eye to the reports of adverse side effects. There is no indication that Carter–Wallace knew, or should have known, of the connection between Felbatol and aplastic anemia before August 1, 1994. Although this connection was subsequently made, the allegations do not support the inference that Carter–Wallace was reckless in failing to have made it earlier.

Because there was no statistical link between Felbatol and any adverse side effect before August 1, 1994, the pleadings do not "give rise to a strong inference of fraudulent intent." As argued by Carter–Wallace, the pleadings represent an impermissible attempt to plead "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). While it may now seem clear that Felbatol was not as safe as advertised, at the time the advertisements ran, it was not reckless for Carter–Wallace to believe the assertions to be true. Indeed, before August 1, 1994, no adverse side effect had been attributed to Felbatol. Carter–Wallace's awareness of medical reports that could have been random cannot lead to the conclusion that Carter–Wallace was reckless in permitting the advertisements to continue. Felbatol had, after all, survived the extensive testing process required by the FDA. *See generally* 21 C.F.R. §§ 312, 314 (1999). Carter–Wallace acted reasonably once the linkage was established between aplastic anemia and Felbatol. Immediately after receiving four adverse reports of aplastic anemia in July 1994, Carter–Wallace, in conjunction with the FDA, recommended the withdrawal of patients from Felbatol. We are satisfied that the pleadings do not allege scienter as required to survive this motion for judgment on the pleadings. Carter–Wallace's actions—touting Felbatol's safety in medical journals in light of what were then random adverse medical reports—did not constitute recklessness.

Finally, the appellants argue that the district court impermissibly made findings of fact, requiring reversal. We do not believe that the district court's discussion of the involvement of the FDA in the development and regulation of Felbatol, to the extent it involved disputed factual assumptions, contributed to its decision. In any event, we have reached the same conclusion on *de novo* review and do not believe that reversal is warranted.

## CONCLUSION

Because the appellants have failed adequately to plead reckless behavior on Carter–Wallace's part, they have failed to al-

lege scienter. The district court correctly granted Carter–Wallace's motion for judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c) and its decision is affirmed.