SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Michael W. BERGER; Manhattan Investment Fund, Ltd.; and Manhattan Capital Management, Inc., Defendants.

No. 00 CIV. 333(DLC).

United States District Court, S.D. New York.

Nov. 13, 2001.

Peter H. Bresnan, Securities and Exchange Commission, Washington, D.C., for Plaintiff.

Donald J. Cayea, Darren T. Kaplan, Brand, Cayea & Brand, LLC, for defendant Michael W. Berger.

Daniel E. Reynolds, Brian M. Fleischer, Lankler, Siffert & Wohl, LLP, New York, for defendants Manhattan Investment Fund, Ltd. and Manhattan Capital Management, Inc.

## OPINION AND ORDER

COTE, District Judge.

Plaintiff Securities and Exchange Commission ("SEC") moves for summary judgment in this securities fraud action as to defendant Michael W. Berger ("Berger"). The SEC having shown through undisputed evidence that Berger caused materially false statements, about the performance of an offshore fund that he controlled from Manhattan, to be created and disseminated to the fund's investors, the motion is granted.

## BACKGROUND

The SEC brought this action on January 18, 2000, against Berger, the Manhattan Investment Fund, Ltd. (the "Fund"), and Manhattan Capital Management, Inc. ("MCM"), alleging violations of the securities laws, including Section 17(a) of the Securities Act of 1933 ("Section 17(a)"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder ("Rule 10b–5"), 17 C.F.R. § 240.10b–5, and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b–6. Also on January 18, 2000, this Court issued an order freezing the assets of MCM and the Fund, preliminarily enjoining defendants Berger and MCM from violating certain provisions of the federal securities laws, and temporarily restraining the Fund from violating certain provisions of the federal securities laws. By order dated January 19, 2000, a receiver was appointed for defendants MCM and the Fund.[1]

---

1. In March 2000, the appointed receiver caused the Fund and MCM to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On April 10, 2000, the United States Bankruptcy Court for the Southern District of New York approved the appointment of the receiver as Chapter 11 Trustee for MCM and the Fund.

 The SEC and MCM have agreed to a settlement of the SEC's claims against MCM in this action. Final judgment was entered against MCM on October 9, 2001.

Berger filed his answer in this action, asserting a general denial pursuant to the Fifth Amendment to the U.S. Constitution, on May 19, 2000. Pursuant to a series of requests by the parties, discovery in this action was extended from March 2000 to June 18, 2001. Berger's first counsel was replaced on May 30, 2000, by an attorney who was himself relieved on April 5, 2001. Extensions of time were provided to Berger thereafter so that he could procure other representation. Berger's current counsel was retained in July of 2001.

The SEC filed its motion for summary judgment on July 20, 2001. Berger submitted some documentary evidence but did not submit any affidavits in opposition to the motion. In response to arguments made by Berger, the SEC submitted further evidentiary material with its reply.

As a result, Berger's request to file a sur-reply was granted. The motion for summary judgment was fully submitted on November 5, 2001.

### A. Evidence Apart from Berger's Plea Allocution

The following facts, drawn from the evidence submitted by the parties,[2] with the exception of Berger's allocution at the entry of his plea of guilty to securities fraud on November 27, 2000, are undisputed unless otherwise noted.[3] Berger was the President, Secretary, and sole shareholder of defendant MCM, and was a director of the Fund. The Fund was a qualified offshore investment company organized under the laws of the British Virgin Islands, designed for foreign investors and United States tax-exempt investors. According to its confidential offering memorandum ("Of-

2. In support of its motion for summary judgment, the SEC has submitted: account statements for the Fund that were generated on a daily basis by the Fund's clearing broker and custodian, Bear Stearns Securities Corporation ("Bear Stearns"); fictitious "FAM account statements," purportedly generated by Financial Asset Management ("FAM"), a broker-dealer with whom the Fund maintained an account, produced from the files of the Fund; draft Net Asset Value ("NAV") calculations for the Fund, sent by the Fund administrator to the Fund and Berger at MCM; cover letters reflecting correspondence between Berger and the Fund administrator from the files of both the Fund and MCM; final monthly NAV statements as distributed to an investor which match the draft calculations; audited financial statements of the Fund for 1997 and 1998; and "FAM" portfolio appraisal profiles and schedules of realized gains and losses. The SEC has also submitted excerpts from the depositions of FAM employees Debra L. Kennedy and James B. Rader, and of Peter Gutschow, apparently an MCM employee who worked for Berger in connection with the Fund. Affidavits of Scott Talento, a managing director of Bear Stearns; Derek Stapley, a principal of Ernst & Young Bermuda in charge of administration services for the Fund; and Helen Gredd, the Chapter 11

Trustee and former receiver for the Fund and MCM, were submitted in support of the SEC motion. Finally, the SEC submitted the allocution from Berger's plea of guilty to securities fraud.

3. In opposition to the motion, Berger has submitted the following documents as exhibits to a declaration by his attorney: the Fund administrator's checklist for preparation of financial statements, the Fund subscription agreement and offering memorandum, the services agreement between the Fund and its administrator, and the affidavit of William A. Jack, a partner of Deloitte & Touche Bermuda, the Fund's auditor, submitted in a related civil action brought by Fund investors, *Cromer v. Berger*, No. 00 Civ. 2284 (S.D.N.Y.) (DLC). Also as exhibits to his attorney's declaration, Berger has submitted excerpts from the testimony of Peter Gutschow and James Rader given in depositions taken by the SEC in connection with this action, as well as the deposition testimony of Derek Stapley, taken in connection with *Cromer v. Berger*. With his sur-reply, Berger has submitted his own affidavit in which he discusses excerpts of Mr. Stapley's deposition and requests an opportunity to depose Ms. Gredd. His affidavit does not purport to describe what happened from his personal knowledge of events.

fer Memo"), the Fund's investment objective was to achieve capital appreciation by investing primarily in highly liquid listed issues. The Fund had over 200 investors of record.

The Fund maintained a brokerage account at Financial Asset Management, Inc. ("FAM"), a broker-dealer located in Columbus, Ohio. FAM cleared all of its transactions through its clearing broker, Bear Stearns Securities Corporation ("Bear Stearns"), in New York City. As the introducing firm, FAM did not hold any of the Fund's securities or other assets. At all relevant times, the majority of the Fund's assets and securities were held in the Bear Stearns account. In addition, the Fund maintained accounts with approximately 12 to 15 other brokerage firms in the United States, approximately half of which are located in Manhattan. All securities transactions through these firms on behalf of the Fund also cleared through Bear Stearns. The Fund traded exclusively in stocks traded on U.S. stock exchanges or quoted on the NASDAQ.

MCM is a Delaware corporation, headquartered in New York City. Pursuant to an Investment Advisory Agreement between MCM and the Fund, MCM served as the investment advisor of the Fund and was paid a management fee at an annual rate of 1% of the Fund's Net Asset Value ("NAV"). Under the agreement, MCM was also paid an incentive fee equal to 20% of the net realized and unrealized appreciation of the NAV per share. MCM received several million dollars pursuant to the Investment Advisory Agreement with the Fund.

Berger owns and controls MCM and is the company's only officer. MCM has no directors, and Berger was solely responsible for overseeing MCM's day-to-day operations in New York and supervising its six employees. While the Fund had three directors, Berger was the only one who was actively involved in the Fund's daily operations. No meetings of the Fund's board of directors were held, and the Fund had no employees. In sum, MCM and the Fund were a one-man show, with Berger making all substantive investment decisions.[4]

The Fund commenced trading operations in or about Spring 1996, with an investment strategy that primarily involved the concentrated short-selling of securities of certain internet and technology-related U.S. companies. Because the prices of most internet stocks increased dramatically between 1996 and 2000, the Fund consistently suffered losses. Those losses now total nearly $400 million.[5]

The fraudulent scheme began almost immediately. Rather than accurately reporting the losses that the Fund was experiencing, as reflected in the daily Bear Stearns statements, Berger used the Bear Stearns statements as templates to create fictitious account statements, purportedly generated by FAM. FAM never created any account statements of any sort relating to the Fund. Fictitious FAM statements, as well as MCM facsimile transmittal letters purporting to attach monthly Fund account statements, have been retrieved from MCM's computers. These fictitious FAM statements substantially overstated the market value of the Fund's holdings.

4. While Berger has made arguments · addressed to the SEC's evidence of his control of MCM and the Fund, he has not offered evidence to support a contrary conclusion.

5. During the time that the Fund was in operation, it obtained approximately $592.8 million in investments, paid out approximately $143.1 million in redemptions, and sustained approximately $393.1 million in net trading losses.

Berger caused a fictitious FAM statement to be forwarded to the Fund administrator in Bermuda every month for 39 consecutive months.[6] Although the Fund administrator also received accurate account statements directly from Bear Stearns, Berger instructed the administrator to ignore them because he claimed they were not reflective of the Fund's entire portfolio. Thus, the administrator calculated the Fund's NAV and the market value of each investor's shares in the Fund based on the fabricated FAM statements, and sent monthly account statements based on these calculations to the Fund's investors.

In a telephone call on January 11, 2000, to Derek Stapley, a principal of FASB who oversaw administration of the Fund, Berger stated that he had made serious mistakes and wrong decisions and that the Fund had suffered significant losses. The next day, Berger informed Stapley and other FASB personnel that the Fund had suffered substantial losses and that the calculation of the Fund's NAV was based on misrepresentations. In a letter sent to all shareholders in the Fund on January 14, 2000, Berger stated that "the financial statements of the Fund that have been distributed over the last several years have been inaccurate" and that "the Fund's actual net assets are substantially less than those previously reported."

## B. *Plea Allocution*

A criminal proceeding was commenced against Berger in the Southern District of New York in August of 2000. On November 27, 2000, Berger entered a plea of guilty to securities fraud charges under Section 10(b) and Rule 10b–5. While under oath and represented by experienced counsel, Berger stated that he wished to plead guilty to securities fraud. Berger admitted that he was the sole principal of the Fund, and that because of his belief that technology and internet-related stocks were grossly overvalued, the Fund engaged in "a contrarian strategy" of trading "short stocks." He admitted that the market turned against him and caused the Fund "to incur significant losses." Frankly conceding that he had not been able to acknowledge the enormity of those losses, Berger admitted that, while acting from the Southern District of New York, he caused others to issue false account statements to investors starting in or about September 1996. Finally, Berger admitted that, at the time he caused others to do these acts, he knew it was unlawful.

When asked to summarize the Government's evidence against Berger that would be produced at trial, the Assistant United States Attorney stated:

> The government would show that Mr. Berger ran a hedge fund called The Manhattan Investment Fund, primarily through an investment company called Manhattan Capital Management, which was located ... here in Manhattan. He started selling shares in the hedge fund in or about April of 1996 and over the years received over $575 million from investors .... After a few months, in 1996, however, Berger began losing large sums of money in the market, primarily by pursuing a strategy of short-selling technology and Internet-related stocks. In or about September of 1996, Berger began falsifying the hedge fund in information that he provided to the administrator and auditor to conceal

---

**6.** At all relevant times until February 1, 1997, Kempe & Whittle Associates, Ltd. ("K & W") provided fund administration services to the Fund. From February 1, 1997 through January 12, 2000, Fund Administration Services (Bermuda) ("FASB") served as the Fund's administrator. FASB is a division of Ernst & Young (Bermuda).

the fund's losses. He caused false statements to be sent to the administrator and auditors, and the investors in return received statements from the administrator that falsely represented the value of their shares in the fund.

When asked if he agreed with the above presentation by the Government, Berger responded "Yes." Berger's counsel at the time, Paul Grand, also read the following statement which had been prepared by "[his] office with Mr. Berger" into the record:

> Over a period of several years, I was the manager of the Manhattan Investment Fund, an offshore hedge fund. During that time, I caused false statements to be generated for the fund, which had the effect of misrepresenting its performance to investors, including potential investors who invested based on false information.

On September 24, 2001, represented by new counsel, Berger filed a motion to withdraw his guilty plea.

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [7] Rule 56(c), Fed. R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

7. Berger argues that the allegations pressed by the SEC in its Complaint fail to comply with the requirements of Rule 9(b), Fed. R.Civ.P. Once a summary judgment motion is filed, the non-movant's obligation is to address the evidence offered in support of the merits of the claims.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

### A. Subject Matter Jurisdiction

■ As an initial matter, Berger alleges that there is a material question of fact as to whether this Court has jurisdiction over the subject matter of this action.[8] In an Opinion in a related action, familiarity with which is assumed, this Court described the tests applicable to a determination of subject matter jurisdiction. *Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452, 479–81 (S.D.N.Y.2001).

8. Having consented to this Court's jurisdiction over the litigation, Berger now raises for the first time the Court's jurisdiction over the matter as a fact issue requiring trial. Berger consented to this Court's subject matter jurisdiction when he consented to the preliminary relief on January 18, 2000, both on his own behalf as well as on behalf of MCM.

The undisputed evidence is sufficient to establish subject matter jurisdiction. Although the Fund operated as a qualified offshore investment fund, and substantial activities for the Fund—including marketing efforts, administration and auditing—were conducted outside of the United States, the fraud was run from the United States and the decisions made in the United States were directly responsible for investor losses. Specifically, the fraud was conceived and executed in New York by Berger, who implemented the scheme through his wholly-owned company, MCM, a Delaware corporation with its principal place of business in New York. The Offer Memo advertises the Fund to "U.S. entities subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or other entities exempt from U.S. tax," among others.[9] Berger's investment strategy principally involved the concentrated short selling on American exchanges of securities of United States technology companies. The Fund's securities transactions were cleared in New York by Bear Stearns and the Fund's assets were in Bear Stearns' custody in New York. Berger prepared the fictitious financial statements in New York. These statements were then sent offshore to the Fund's administrators, and then calculations based on these statements were retransmitted back into this country and abroad to prospective investors, current shareholders, and their agents.

Berger has offered no evidence to raise a question of fact regarding the Fund activities conducted in the United States, instead arguing that the Fund's qualified offshore status and the extent of activities undertaken outside of the United States deprive this Court of subject matter jurisdiction. Particularly as an enforcement action pursuant to the securities laws of the United States addressing a fraud conceived and executed in New York, this matter is properly before this Court. *See Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 33 n. 3 (D.C.Cir.1987) ("[T]here may be more reason to find jurisdiction in a case ... which was brought by the SEC, than in a case ... brought by foreign private individuals.").

### B. *Sections 10(b) and 17(a)*

▆ To have violated Section 10(b) and Rule 10b–5, a defendant must have:

> (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.

*SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999).[10] The standard for a

---

**9.** Berger argues that the SEC has presented insufficient evidence that there were United States investors in the Fund. He describes documentation that he argues shows that some, although not all, of the investors with United States addresses may have been acting as agents for non-United States entities. For instance, he does not provide any evidence to refute the documentation indicating that Goldman Sachs Performance Partners (Offshore), L.P., which used the New Jersey address of its general partner, had shareholders which included tax-exempt U.S. investors. In any event, even if there were no United States investors, because Berger took significant steps in the United States in furtherance of his fraudulent scheme, this Court properly has jurisdiction over an enforcement action arising from this conduct. *See, e.g., Alfadda v. Fenn*, 935 F.2d 475, 478–79 (2d Cir.1991) (citing Restatement (Third) of Foreign Relations Law of the United States § 416(d) (1987)).

**10.** Despite Berger's arguments to the contrary, the SEC is not required to prove reliance or injury to support entry of a judgment for violations of the securities laws. *See SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996).

violation of Section 17(a) is "essentially the same ... though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *Id.* The Second Circuit has explained that the element of scienter requires a plaintiff "to show that the defendant acted with intent to deceive, manipulate or defraud, or at least knowing misconduct." *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 194 (2d Cir.1998).

■ Summary judgment is appropriate on the Sections 10(b) and 17(a) claims. There is ample undisputed evidence to support a finding of liability, and Berger has not presented evidence raising a question regarding any material fact. Indeed, the SEC has presented sufficient evidence to support judgment in either of two independent ways: Berger's admissions in his plea allocution and the other admissible evidence.

■ In opposing the SEC's summary judgment motion, Berger first argues that the SEC cannot rely on his plea allocution because it is not admissible under the Federal Rules of Evidence, and because he has moved to withdraw his plea. Berger's own statements at his plea allocution, including his explicit and unambiguous agreement with the description of evidence given by the Government, are admissions under Rule 801(d)(2)(A), Fed.R.Evid. The statement read by Berger's counsel at the time is properly admitted into evidence under Rules 801(d)(2)(C) and (D), Fed.R.Evid.

■ Unless and until Berger's motion to withdraw his plea is granted, that plea is properly considered on a motion for summary judgment. *Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir.1986). "[T]he fact that a guilty plea *may* be withdrawn is not sufficient to render it inadmissible." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 403 (8th Cir.1995) (emphasis in original). *Compare* Rule 410(a), Fed.R.Evid.; *United States v. Udeagu*, 110 F.R.D. 172, 174 (E.D.N.Y. 1986).

■ Berger's attacks on the remainder of the SEC's evidence can be swiftly rejected. Berger has offered the deposition testimony of Peter Gutschow, which he contends raises a question of fact as to whether Berger controlled MCM. Peter Gutschow worked for Berger, apparently as an MCM employee, in connection with the Fund. While the Gutschow testimony indicates that FAM was responsible for the payment of some of MCM's operating expenses, Mr. Gutschow also testified that Berger dominated and controlled MCM, and that the company was a one-man show. Evidence that FAM assisted MCM in the payment of its operating expenses, without more, is not sufficient to raise a material question of fact as to Berger's control over decision-making at MCM and for the Fund.

■ Berger has offered evidence which he contends raises a question of fact as to whether the Fund administrator actually used the "FAM statements" sent by Berger instead of the Bear Stearns statements in calculating the Fund NAVs. He relies on the checklist employed by FASB as Fund administrator for the NAV calculation process, which lists review of the Bear Stearns account statements as a step in the calculation process. While this document indicates that the Fund administrator was supposed to review the Bear Stearns account statements, it does not tend to establish that the administrators' NAV calculations were in fact derived from the Bear Stearns statements. A comparison of the Bear Stearns statements and the NAV calculations, both of which are offered by the SEC in support of this motion, shows that the latter were not derived from the former. In contrast,

an examination of the fictitious FAM statements, also offered by the SEC, demonstrates that the administrators' NAV calculations were based on the statements provided by MCM.

■ Relying on deposition testimony given by Derek Stapley in a related action,[11] Berger contends that Mr. Stapley's affidavit submitted by the SEC in support of this motion is unreliable. Berger contends that Stapley's deposition testimony demonstrates that he lacks the personal knowledge necessary to assert that Berger sent FAM statements to FASB. Derek Stapley was the principal of Ernst & Young Bermuda in charge of administration services for the Fund. In his affidavit, Stapley attests that "Berger through MCM sent FAM statements by facsimile transmission to FAS Bermuda for each of the months January 1997 through November 1999." Stapley's deposition indicates that he was the engagement partner who exercised overall responsibility for the work performed by FASB for the Fund, and that he directed the engagement from early 1995 until January 2000. In his deposition testimony, Stapley refers to meetings held with Berger regarding the Fund, and describes his familiarity with the work the administrator performed for the Fund. When taken in context, the deposition passages to which Berger points confirm that Stapley was familiar with the process by which MCM and Berger communicated with FASB, although not with all the details of that communication. An example of the kind of passage on which Berger relies, and indeed the one which provides the most support for his argument, is as follows:

Q: In connection with the preparation of the monthly NAVs, Mr. Stapley, what information, if any, did you or anyone working for you receive from New York?

A: I don't know all the precise details, because I don't get involved in the precise details. But I understand that we would get confirmation from Berger of the reports produced by FAM, and there would also be possibly some documentation, but I would expect some discussions regarding other items, like expenses, and so on.

The deposition testimony continued:

Q: Was a draft NAV calculation performed by Mr. Berger in New York or did you take the information that he provided and do that calculation in Bermuda?

A: The NAV calculation would be performed in Bermuda, and the procedure would be to coordinate with the investment manager to get the investment manager's comments on the draft NAV.

Q: So I take it from that, you would send a draft NAV calculation to Mr. Berger for him to review and sign off on?

A: I can't speak for the entire engagement, but for the latter part, I've seen the documentation that evidences that.

Q: What form did those communications back and forth with Mr. Berger take?

. . .

A: Written form by facsimile.

Taken altogether, these passages and others from Stapley's deposition testimony evidence that he was sufficiently involved in FASB's engagement with the Fund to provide competent evidence regarding the flow of information between the administrator and Berger.

---

11. The deposition testimony of Derek Stapley was taken in connection with the class action brought on behalf of Fund investors, *Cromer v. Berger,* No. 00 Civ. 2284 (S.D.N.Y.) (DLC).

■ Berger contends that a grant of summary judgment would be premature since he has not had an opportunity to depose Derek Stapley, Scott Talento, a managing director of Bear Stearns, or Helen Gredd, the Chapter 11 Trustee and former receiver for the Fund and MCM. Affidavits from these three individuals were submitted by the SEC with its initial and reply papers on this motion to establish (1) the information exchanged between Berger and the Fund administrator, (2) the authenticity of the Bear Stearns statements and the fact that these statements went sent to the Fund administrator, and (3) that "FAM account statements" and cover letters were retrieved from the MCM computers.

Discovery spanned more than fifteen months. The SEC did not bring its summary judgment motion until after the discovery period had ended. During the discovery period, Berger conducted no depositions and served no interrogatories. The SEC produced many documents to Berger in response to his document requests, providing him with a comprehensive factual record covering all the allegations in the complaint. Ms. Gredd also provided many documents to Berger. At no point during the discovery period did Berger complain that the SEC or anyone else had failed to cooperate in the discovery process. During that process, Berger repeatedly invoked his Fifth Amendment privilege against self incrimination in response to efforts by the SEC to obtain evidence from him.

A party opposing a summary judgment motion will be entitled to further discovery before the motion will be considered when he submits a Rule 56(f), Fed.R.Civ.P., affidavit explaining:

(1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and

(2) how those facts are reasonably expected to create a genuine issue of material fact; and

(3) what efforts the affiant has made to obtain those facts; and

(4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985). In addition,

[a] court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered.

*Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994).

Berger contends that Mr. Stapley's affidavit "is an irony of contradictions," and that he would like to depose Mr. Stapley and a "knowledgeable witness" from the Fund's auditor, Deloitte & Touche Bermuda, to learn what was done with the audits. While Berger explains that he wishes to take the depositions of Mr. Talento and Ms. Gredd to inquire as to the sources of their knowledge, he has not offered any evidence to rebut any statement made by these affiants. In their affidavits, each witness explains the basis for the information he or she provides. Moreover, Berger does not explain how any information in their possession would create an issue of fact regarding his liability or why he did not take their depositions during the discovery period.[12] For instance, he has not

---

12. Berger makes one additional argument with respect to the Gredd affidavit, stating in a footnote in his sur-reply, "How one establishes a document as authentic under the Federal Rules of Evidence by comparing it with a partially recovered deleted computer file at another location is anybody's guess." Rule 901(b)(1) provides that a witness with knowl-

offered any evidence to explain why the "FAM account statements" and cover letters could not have been on the MCM computers. In sum, while Berger has provided some indication of the nature of the discovery he now seeks from these three witnesses, he has not demonstrated (1) how such additional discovery is reasonably expected to create a fact issue, (2) what efforts he made to obtain the desired factual information during the discovery period, and (3) why those efforts were unsuccessful. Because Berger's application for additional discovery pursuant to Rule 56(f), Fed.R.Civ.P., falls short of the standard set by the Second Circuit in *Burlington Coat Factory*, 769 F.2d at 926, that application is denied.

Either through Berger's plea allocution or through other documentary and testimonial evidence, the SEC has offered sufficient evidence of Berger's liability on the Sections 10(b) and 17(a) claims. Because Berger has offered no evidence creating an issue of material fact regarding these causes of action, summary judgment is appropriate.

C. *Investment Adviser Liability—Sections 206(1) and 206(2)*

Section 206 of the Advisers Act provides that:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which oper-

ates as a fraud or deceit upon any client or prospective client . . . .

15 U.S.C. § 80b–6. Section 202(a)(11) defines an "investment adviser" as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . . .

15 U.S.C. § 80b–2(a)(11). This Circuit has held that "persons who manage[ ] the funds of others for compensation are 'investment advisers' within the meaning of the statute." *Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir.1977). Although not yet expressly addressed by this Circuit, facts showing a violation of Sections 10(b) or 17(a) by an investment advisor will also support a showing of a Section 206 violation. *See SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363 n. 4 (9th Cir.1993). In light of the foregoing, summary judgment is appropriate on the SEC's Advisers Act claim upon a showing that Berger was an "investment adviser" under the Advisers Act.

■■■ The text of the Investment Advisory Agreement between MCM and the Fund establishes that MCM qualifies as an "investment adviser" under the Advisers Act. The agreement states that MCM "undertakes to act as investment advisor" of the Fund, and in such capacity, shall "direct the investments of the [Fund]." The

---

edge may authenticate evidence by testifying that a matter is what it is claimed to be. In her affidavit, Ms. Gredd attests that the records she retrieved from MCM's computers are the same as those attached to the affidavit of Peter Bresnan, also submitted in connection with this summary judgment motion. The ability to make such a comparison is well within an affiant's personal knowledge and, as such, the contents of the Gredd affidavit are properly considered in connection with the present motion. *See United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir.2001).

agreement further specifies the compensation for such advisory services. Because Berger effectively controlled MCM and its decisionmaking, Berger is also properly labeled an investment adviser within the meaning of the Advisers Act. Thus, summary judgment is also appropriate on plaintiff's claim under the Advisers Act.

### D. *Remedies*

 Finally, the SEC seeks the following remedies: a permanent injunction, disgorgement, prejudgment interest on the amount of disgorgement, and a civil monetary penalty. Once a violation of the federal securities laws has been found, a district court "has broad equitable power to fashion appropriate remedies." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir.1996).

### 1. *Permanent Injunction*

 A permanent injunction is appropriate where " 'there is a likelihood that, unless enjoined, the violations will continue.' " *Id.* at 1477 (quoting *Commodity Futures Trading Commission v. American Board of Trade, Inc.*, 803 F.2d 1242, 1250–51 (2d Cir.1996)). A permanent injunction may be particularly appropriate where a violation was "founded on systematic wrongdoing, rather than an isolated occurrence," or involved a "high degree of scienter." *Id.* (quoting *United States v. Carson*, 52 F.3d 1173, 1184 (2d Cir.1996) and *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir.1994)).

 Berger's fraudulent behavior did not arise from a single, isolated incident, but rather represented a continuing course of wrongful conduct lasting for more than three years. The record further reflects that Berger acted willfully and knowingly in carrying out the fraud. Because of his history and experience in the securities markets, there is reason to believe that

Berger might attempt to return to investment activity in the future. Based on the above facts, there is a likelihood that, unless enjoined, Berger will continue to violate the federal securities laws. Accordingly, the SEC's request to enjoin Berger permanently from future violations of Section 10(b), Rule 10b–5, Section 17(a), and Sections 206(1) and (2) of the Advisers Act is granted.

### 2. *Disgorgement; Pre–Judgment Interest*

 A district court also has broad discretion to order disgorgement of profits from illegal activities. *Id.* at 1474. "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *Id.*

 In deciding whether to award prejudgment interest, the full compensation of victims is of primary concern. A court must consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* at 1476 (citation omitted). In an SEC enforcement action, "the remedial purpose of the statute takes on special importance." *Id.* Generally, prejudgment interest at the IRS underpayment rate is appropriate because "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *Id.*

 In this action, the SEC seeks disgorgement in the amount of

$19,874,735.44,[13] with prejudgment interest thereon in the amount of $132,498.24 (representing the time period from January 18, 2000 to March 7, 2000), for a total of $20,007,233.68. The SEC submits that Berger should be held jointly and severally liable for the full amount of disgorgement and prejudgment interest owed by defendant MCM.[14]

█ The trial court has discretion to determine that an officer should be jointly and severally liable where a firm has received gains through its unlawful conduct. *Id.* at 1475. Such relief is appropriate where it is shown that the individual was "intimately involved" in the violation of the securities laws. *Id.* In this case, Berger conceived of and executed the fraud. He is the sole owner of MCM stock, and MCM's only officer and director. For this reason, it is appropriate to hold him jointly and severally liable for disgorgement of the ill-gotten gains of his fraudulent operation.

3. *Civil Monetary Penalty*

█ Finally, the SEC asks that the Court impose a civil monetary penalty pursuant to Section 20(d) of the Securities Act of 1933, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(3). These statutes provide that the amount of the penalty "shall be determined by the court in light of the facts and circumstances." 15 U.S.C. § 78u(d)(3)(B)(i); 15 U.S.C. § 77t(d)(2)(A). The SEC asks that the statutory maximum penalty of $100,000 be imposed, given the substantial losses caused by Berger's fraudulent misrepresentations. In light of the magnitude and duration of the fraud at issue, as well as the degree of scienter involved, the imposition of a civil penalty in the amount of $100,000 is appropriate in this case.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment against defendant Michael W. Berger is granted. Accordingly, it is hereby

ORDERED that defendant Michael W. Berger is permanently restrained and enjoined from violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6(1) and (2). It is further

ORDERED that Michael W. Berger is liable for disgorgement in the amount of $19,874,735.44, together with prejudgment interest in the amount of $132,498.24, for a total of $20,007,233.68. It is further

ORDERED that Michael W. Berger shall pay a civil penalty of $100,000 pursuant to Section 20(d) of the Securities Act of 1933, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(3). It is further

ORDERED that the Clerk of Court shall enter judgment for the plaintiff and close the case.

SO ORDERED:

---

13. This figure reflects the amount in management and incentive fees paid to MCM pursuant to its Investment Advisory Agreement with the Fund between January 1, 1997 and January 18, 2000.

14. On October 9, 2001, this Court entered final judgment as to defendant MCM in the amount of $20,007,233.68.